## 149 MADISON AVENUE CORP. ET AL. *v.* ASSELTA ET AL.

No. 497.   Argued February 11, 1947.—Decided May 5, 1947.

*Robert R. Bruce* argued the cause for petitioners. With him on the brief were *Walter Gordon Merritt* and *John J. Boyle.*

*Wilbur Duberstein* argued the cause for respondents. With him on the brief was *Frederick E. Weinberg.*

Briefs were filed as *amici curiae* by *Samuel I. Rosenman, Godfrey Goldmark* and *Richard S. Salant* for the Midtown Realty Owners' Association, Inc., and *Murray I. Gurfein* for the 128 West 30th Street Corporation et al., urging reversal.

*Acting Solicitor General Washington, William S. Tyson, Bessie Margolin* and *Morton Liftin* filed a brief for the Wage & Hour Administrator, United States Department of Labor, as *amicus curiae*, urging affirmance.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

This employee suit was brought in the District Court to recover overtime compensation, liquidated damages, and a reasonable attorney's fee pursuant to §§ 7 (a) and 16 (b) of the Fair Labor Standards Act of 1938.[1]  Recovery was allowed in the District Court, 65 F. Supp. 385, and that judgment was affirmed in the Circuit Court of Appeals. 156 F. 2d 139.  We granted certiorari to consider the

---

[1] 52 Stat. 1060, 29 U. S. C. § 201 *et seq.*  Insofar as pertinent, § 7 (a) provides:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

.     .     .     .     .

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Section 16 (b) provides in part:

"Any employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . ."

important questions presented relating to the application of the overtime provisions of the above-mentioned statute.

Respondents are service and maintenance employees who, during the period in question, worked in a loft building owned by petitioner 149 Madison Avenue Corporation and managed by petitioner Williams & Co. It has been stipulated that respondents were engaged in the production of goods for commerce.[2] We are here concerned with the period of employment extending from April 21, 1942, to December 10, 1943.

Prior to April 21, 1942, employment relations between the petitioners and respondents were governed by a collective wage agreement, known as the Sloan Agreement.[3] According to its terms, employees were paid flat weekly wages for workweeks of specified length which, in the case of most of the respondents, amounted to $25 for 47 hours of weekly employment. No hourly rates were specified, nor was any attempt made to compensate employees at the rate of time and one-half for hours worked in excess of 40 in any week.

As the expiration date of the Sloan Agreement drew near, negotiations between the interested parties were initiated for the purpose of reaching agreement on a new contract. After preliminary conferences proved fruitless, the case was certified to the War Labor Board. That

---

[2] Petitioners have raised no objection as to the amount of the recovery allowed the respondents by the District Court if it be assumed that the lower courts otherwise correctly determined their liability.

[3] The Sloan Agreement was negotiated between the Realty Advisory Board on Labor Relations, Incorporated, as agent for various owners of loft, office and apartment buildings located in the Borough of Manhattan in the City of New York, and Local 32-B of the Building Service Employees International Union on behalf of its members. The same parties negotiated the agreement in question.

agency stated its recommendations in a directive order issued July 29, 1942; and on September 1, 1942, the parties entered into the agreement in question, known as the National War Labor Board Agreement. It had been agreed that the terms of the new contract were to be made retroactive to April 20, 1942, the expiration date of the Sloan agreement.

The new contract provided for a workweek of 54 hours applicable to watchmen and a workweek of 46 hours for other regular employees. Weekly wages were established to compensate the 54 or 46 hours of labor, which sums were stated to include both payments for the regular hours of employment and time and one-half for the hours in excess of 40. To derive the hourly rate from the weekly wage, the following formula was included:

"The hourly rates for those regularly employed more than forty (40) hours per week shall be determined by dividing their weekly earnings by the number of hours employed plus one-half the number of hours actually employed in excess of forty (40) hours."

Although a literal reading of the above language might seem to indicate the establishment of a variable hourly rate dependent upon the number of hours actually worked in any given week, such was not the practical construction of the parties. Instead of making use of the number of hours actually worked, only the hours the employee was scheduled to work and the weekly wage for such scheduled workweek entered into the calculation of the non-overtime hourly rate.[4] The hourly rate as derived from the formula remained constant, therefore, regardless of whether the employee worked the scheduled number of hours during the week or a greater or lesser number. In effect, the

---

[4] In case of an employee hired for a regular 46 hour week at a weekly wage of $27.50, the "hourly rate" was derived from the formula by means of the following calculation: $27.50÷[46+½(46−40)]= $.561 per hour. In effect, the formula rate is obtained, not by dividing

agreement instead of directly stating a fixed hourly rate in terms of a stipulated amount per hour provided a formula whereby such a fixed hourly rate could be calculated.

Under the agreement, weekly compensation varied according to the number of hours worked in that week. Thus, in case an employee was unable to work all his scheduled hours due to an "excusable cause," he was paid at the formula rate with the provision, however, that six of the hours worked should be compensated as overtime regardless of whether the total of hours actually worked was greater or less than 40 in that week. If the employee's absence was not excusable, he was apparently paid a sum for the week obtained by multiplying the number of hours actually worked times the formula rate, being given credit for overtime only in case the number of hours worked exceeded 40.[5] The agreement provided that all regular employees except watchmen should be compensated at a rate one and three-quarters times the hourly rate derived from the formula for hours worked in excess of 46. Watchmen were to be paid twice the formula rate for hours worked in excess of 54. Part-time workers employed for less than the scheduled workweek were hired at a specified schedule of hourly rates obtained by dividing the weekly wage paid the regular employees by the number of hours in the regular workweek.

It was not the purpose of Congress in enacting the Fair Labor Standards Act to impose upon the almost infinite

---

the weekly wage by 46, the number of hours scheduled to be worked, but by dividing that sum by 49, a divisor determined by the formula. In the case of a watchman hired for a 54 hour week at the same weekly wage, the formula rate was determined by this calculation: $\$27.50 \div [54 + \frac{1}{2}(54-40)] = \$.4508$ per hour.

[5] The agreement made no specific provision for situations involving unexcused absences. The above-described procedure seems to have been applied in practice, however.

variety of employment situations a single, rigid form of wage agreement. *Walling* v. *Belo Corp.*, 316 U. S. 624 (1942). Section 7 (a) of the Act requires, however, that any wage agreement falling within its purview must establish an hourly "regular rate" not less than the statutory minimum and provide for overtime payments of at least one and one-half times the "regular rate." A wage plan is not rendered invalid simply because, instead of stating directly an hourly rate of pay in an amount consistent with the statutory requirements, the parties have seen fit to stipulate a weekly wage inclusive of regular and overtime compensation for a workweek in excess of 40 hours and have provided a formula whereby the appropriate hourly rate may be derived therefrom. The crucial questions in this case, however, are whether the hourly rate derived from the formula here presented was, in fact, the "regular rate" of pay within the statutory meaning and whether the wage agreement under consideration, in fact, made adequate provision for overtime compensation.

We have held that the words "regular rate," while not expressly defined in the statute, ". . . mean the hourly rate actually paid for the normal, non-overtime workweek." *Walling* v. *Helmerich & Payne, Inc.*, 323 U. S. 37, 40 (1944). The regular rate is thus an "actual fact," and in testing the validity of a wage agreement under the Act the courts are required to look beyond that which the parties have purported to do. *Walling* v. *Youngerman-Reynolds Hardwood Co.*, 325 U. S. 419, 424 (1945). It is the contention of the respondents that the rate derived by the use of the contract formula was not the regular rate of pay; that the regular rate actually paid was substantially that obtained by dividing the weekly wage payable for the working of the scheduled workweek by the number of hours in such scheduled workweek; and that, consequently, the plan made no adequate provision for over-

time compensation until employees regularly hired as watchmen had worked a total of 54 hours in one week and until other regular employees had worked a total of 46 hours. We believe that the record provides ample support for that view.

Thus, in determining a schedule of hourly rates payable to part-time workers employed less than 40 hours a week, no use whatsoever was made of the hourly rate derived from the formula. Part-time workers were paid a rate determined by dividing the weekly wage paid to the regular employees by the number of hours in the regular workweek despite the fact that, according to the terms of the formula, the weekly wage included both regular and overtime pay. Insofar as part-time workers were concerned, the agreement clearly indicated an intention to compensate an hour's labor by payment of a pro-rata share of the weekly wage.

Nor was there consistent application of the hourly rate as determined by the formula to the work of regular employees hired for a full 46-hour week. Where such an employee was absent for an "excusable cause," his weekly compensation was not determined by multiplying the formula rate by the hours worked. Rather, six of the hours the employee worked were always treated as overtime and compensated at the rate of one and one-half times the formula rate regardless of the total hours actually worked, thus resulting in average hourly compensation considerably in excess of the formula rate. The payment of "overtime" compensation for non-overtime work raises strong doubt as to the integrity of the hourly rate upon the basis of which the "overtime" compensation is calculated. Cf. *Walling* v. *Helmerich & Payne, Inc., supra.* While the average hourly rate actually received by the employee in this situation was not precisely that which would have resulted from dividing the weekly wage by 46, it ordinarily approached that figure much more closely

than it did the so-called hourly rate established by the formula.[6] This method of payment reveals further evidence of an attempt to pay a pro-rata share of the weekly wage for an hour's labor regardless of the number of hours worked up to 46.

The agreement provided that hours worked in excess of the scheduled 46-hour week should be compensated at the rate of one and three-quarters of the formula rate.[7] While the formula rate seems to have been consistently applied in such situations, it is significant to observe that the amount received by the worker under these circumstances approximates very closely that which he would have received had he been paid an hourly rate determined by dividing the weekly wage payable for the scheduled workweek by 46 with payment of time and one-half for hours worked in excess of 46.[8] This approximation was

---

[6] Thus the employee Anderson worked only 39 hours in the week of Feb. 14, 1943, the 7 hours of absence apparently being due to an "excusable cause." Under the agreement, which would entitle him to six hours of "overtime" pay, he should have received weekly compensation in the amount of $23.56. The actual average hourly rate during that week accordingly would be $.604. If Anderson had been paid on an hourly basis determined by dividing the weekly wage paid for a scheduled workweek by the number of hours in such workweek, he would have received $.598, whereas, had he been paid the straight formula rate he would have received $.561 per hour. So also, the petitioner Peterson in the week of Dec. 13, 1942, was absent 16 hours for excusable causes. The payroll records reveal he earned $18.50 or an actual average hourly rate of $.617 as compared to $.598, the average rate for a scheduled workweek, and to $.561, the formula rate.

[7] In the case of watchmen, who were assigned a scheduled week of 54 hours, twice the formula rate was paid for hours worked in excess of 54.

[8] Thus if an employee hired for a regular workweek of 46 hours at $27.50 worked 50 hours in one week, his total weekly compensation would amount to $31.43 if compensated in accordance with the terms of the agreement. If, instead, the employee were hired on a straight weekly basis at the same weekly wage with provision for time and

not fortuitous. In the directive order of the National War Labor Board the origin and purpose of these provisions are discussed, and the following statement is made: "Overtime over forty-six (46) hours is paid at a rate of time and three-quarters in an effort approximately to equal *the overtime to which an employee would ordinarily be entitled, if it were computed on the basis of time and a half after a forty-six (46) hour week."* [9]

Petitioners have argued that none of these provisions provides a conclusive demonstration that the formula rate was not the actual regular rate of pay. It is said that part-time employees were paid a pro-rata hourly rate since they had no opportunity to earn overtime compensation; that the method of paying regular employees in case of excusable absences was merely a laudable effort on the part of the employer to compensate more fully than the Act requires when an employee failed to work his scheduled week because of illness or like causes; and that the time and three-quarters provision represented an additional premium for employees called upon to work hours

---

one-half the average hourly rate, for hours worked in excess of 46, he would receive $31.09 as total weekly compensation for 50 hours of work. If a watchman, scheduled to work a 54-hour week at $27.50 actually worked 58 hours he would receive $31.11 weekly compensation if calculated according to the agreement, or $30.55 if calculated on a straight weekly basis with time and one-half for hours worked in excess of 54.

[9] (Emphasis supplied.) The agreement in question also contained the following provision: "Per diem rates of pay of any employee shall be arrived at by dividing the applicable weekly wage by the normal number of days per week worked by that employee in the building in question." This provision is obviously at odds with the statement in the agreement that the weekly wage stipulated for a scheduled workweek included both regular pay and overtime for hours worked over 40. There is nothing in the record, however, to indicate that the per diem provisions were actually applied. Petitioner explains its presence in the agreement as an inadvertent hold-over from the earlier Sloan Agreement.

substantially in excess of the non-overtime week. We cannot ignore the fact, however, that the agreement on its face fails to provide for the consistent application of the formula rates in those situations where such rates should be expected to control. These deviations take on additional significance when it is observed that in every situation, with the relatively unimportant exception of that involving unexcused absences,[10] the amount paid was either precisely or substantially that which employees would have been paid had the contract called for employment on a straight 46-hour week with payment of time and one-half only for hours worked in excess of 46.

Further light is thrown upon the nature of the wage agreement by a consideration of the plan in actual operation. During the period between April 21 and September 1, 1942, when the contract in question was the subject of negotiation, it was understood that the old Sloan Agreement should remain in effect but that the terms of the new contract should be given retroactive application to April 20. The Sloan Agreement provided for a minimum wage of $25 for a workweek of 47 hours with no provision for overtime for hours worked in excess of 40. It is obvious, therefore, that between the above-mentioned dates the employees were paid on a basis clearly repugnant to the requirements of § 7 (a) of the Fair Labor Standards Act. Petitioners urge, however, that by making the retroactive payments as required by the agreement, any illegality in the method of payment during the period of negotiations was eliminated. But in attempting to satisfy the retroactive liability, petitioners completely ignored the formula rates and paid each of the respondents $2.50 for each week worked during the period, representing the increase in the minimum weekly wage for the scheduled workweek established by the new agreement,

[10] See note 5 *supra.*

without attempting further adjustment. Petitioners admit that "Undoubtedly some employees who worked no overtime in certain weeks were overpaid; other who worked beyond the scheduled workweek of 47 hours then prevailing may not have been paid enough." It is apparent that the amount of wages paid the respondents for work performed during the period of negotiations was in no sense determined by application of hourly rates derived from the formula.[11]

The parties have called our attention to much other evidence which, it is asserted, reveals the practical construction given to the terms of the agreement in question. We do not feel that it is necessary to review these matters at length. It is sufficient to state that, after considering the terms of the agreement and the operation of the plan in actual practice, we have come to the conclusion that the agreement in this case was one calling for a workweek in excess of 40 hours without effective provision for overtime pay until the employees had completed the scheduled workweek and that the "hourly rate" derived from the use of the contract formula was not the "regular rate" of pay within the meaning of the Fair Labor Standards Act. This is not a case like *Walling* v. *Belo Corp., supra,* or *Walling* v. *Halliburton Oil Well Cementing Co.,* 331 U. S. 17 (1947). Unlike those cases, there was here no provision for a guaranteed weekly wage with a stipulation of an hourly rate which under the circumstances presented

---

[11] A somewhat similar situation prevailed with respect to an increase of $1.40 in the weekly wage granted on October 10, 1943, and made retroactive to April 21, 1943. It appears that petitioners made some effort to make adjustments consistent with the formula in payment to employees who had worked hours in excess of the scheduled workweek. It is conceded, however, that no such adjustments were made with respect to those who worked less than their scheduled hours in weeks during the retroactive period, such employees being paid the full weekly increase for each week employed regardless of hours actually worked.

210

could properly be regarded as the actual regular rate of pay.

We hold for the reasons stated above that the District Court and the Circuit Court of Appeals properly determined that the wage agreement in question failed to satisfy the statutory requirements. *Walling* v. *Helmerich & Payne, Inc., supra; Walling* v. *Youngerman-Reynolds Hardwood Co., supra; Walling* v. *Harnischfeger Corp.*, 325 U. S. 427 (1945).

*Affirmed.*