## CAMERON v. CHICHAGOF MIN. CO.

No. 4798–A.

District Court, Alaska.
First. Div. Juneau.

Sept. 3, 1948.

William L. Paul, Jr., of Juneau, for plaintiff.

Faulkner, Banfield & Boochever, of Juneau, for defendant.

FOLTA, District Judge.

All that remains of this action are the plaintiff's causes of action in which he seeks to recover $1330.13 for unpaid overtime work between October 24, 1938, the effective date of the Act, and February 15, 1941, an equal amount as liquidated damages and attorney fees, under the Fair Labor Standards Act, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.

Plaintiff was employed as a pumpman at $6 a day of eight hours. The regular work week was 56 hours. Defendant was engaged in gold mining and admits, it was subject to the Act during the time here involved except for a brief period which will be later adverted to.

On November 18, 1938, following the loss of the ore body, the mine ceased operating, and on January 1, 1939, was placed in a caretaker status. The company then underwent an internal reorganization, and on February 16, 1939, commenced exploratory work which was terminated on May 5, 1939, without the discovery of pay ore. Underground operations were abandoned, and the machinery removed. Contemporaneously, the construction of a flotation plant was undertaken for the purpose of recovering gold from the tailings which had accumulated during the life of the mine, and this project was completed June 14, 1939.

The first question which presents itself is whether, after the mill clean-up and before construction of the flotation plant was begun, during which time the only activity underground was the exploratory work referred to, the company was engaged in the production of goods for commerce, as defined by the Act. More precisely the question may be formulated as follows: Is prospecting for gold by or for one who is not then engaged in the production of gold for commerce, and who will not be so engaged unless such prospecting is successful, within the Act where no gold is discovered? Unless this is such an overrefinement of the factual situation as the Supreme Court warned against in McLeod v. Threlkeld, 319 U.S. 491, 495, 63 S.Ct. 1248, 87 L.Ed. 1538, it appears to be a question of first impression. The drilling operations, held to be within the Act in Divine v. Levy, D.C., 39 F.Supp. 44, were carried on at the same time that oil was being produced and, hence, it is clear that the drilling was but an incident of the production of oil for commerce. In Warren-Bradshaw v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, it was held that employees engaged in drilling for oil may be regarded as engaged in a process or occupation necessary to the production of oil, that the connection between drilling wells and the capture of oil is quite substantial, and that such activity bears as "close and immediate a tie" to production as did the services of the building maintenance workers in Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. But it should be noted that each drilling job resulted in the production of oil or gas and, hence, the drilling was incidental to the production of oil. Here no gold was discovered and, since, during the entire period in which exploratory work was carried on, no gold was produced by the employer at the mine involved or else-

where, it is not perceived how this prospecting could be said to have been incidental, or a process or occupation necessary, to the production of gold for commerce. It was the sole activity of the company at that time. The circumstance that it had recently been engaged in the production of gold would, therefore, appear to be immaterial. Its position was that of one who engages in prospecting for something that would ultimately enter into commerce if found. Implicit in the statute is the requirement of actual, not speculative, production and that there be more than a mere tenuous or remote relationship between the activity and the product. Here not only was there not even a tenuous connection between the prospecting and the production of gold in commerce but the activity was not even remotely related to the product. To say that such an activity is a process or occupation necessary to the production of goods for commerce is to ignore the requirement of production. So construed the Act would include such activities as the unsuccessful and unproductive labors of inventors. Cf. Parham v. Austin Co., 5 Cir., 158 F.2d 566. It follows, therefore, that neither the defendant nor, as a consequence, the plaintiff, was engaged in the production of goods for commerce during the time which elapsed between the clean-up of the mill on November 23, 1938, and the commencement of construction work on the flotation plant. The evidence is silent as to the date on which this work was undertaken. It having been shown that the employer was within the Act at the beginning and end of the period for which overtime is claimed, the burden of proving that for some part thereof the Act did not apply was on the defendant.

After the flotation plant was completed, recovery of gold was resumed from the tailings, and plaintiff continued as maintenance man above ground at the same pay and for the same work week as before. However, beginning January 1, 1940, the pay slips showed a different method of computing wages. Thus, in the plaintiff's case the rates were shown as $5.25 a day straight time and $7.87 a day overtime (Plaintiff's Exhibits 1, 3 and 4). According to the defendant, this practice was put into effect December 1, 1939, to comply with its understanding of the requirements of the Fair Labor Standards Act. But Plaintiff contends that the notice thereof (Defendant's Exhibit A) was not posted until August 12, 1940, and then only at an entrance to the Post Office which was seldom used; that, in response to inquiries made by employees as to the meaning of the new rates, they were told that it was merely a change in bookkeeping and that their pay would remain as before. This is corroborated by the depositions of several former employees. Indeed, the general manager testified by deposition that under this arrangement the pay of plaintiff, and others whose wages were the same, would be computed at the rate of $5.25 for five-sevenths of the regular work day of eight hours, and at the rate of $7.87 for the remaining two-sevenths. Essentially, this is the so-called Poxon Plan which was invalidated in Walling v. Helmerich & Payne, 323 U.S. 37-40, 65 S.Ct. 11, 89 L.Ed. 29; Robertson v. Alaska Juneau Gold Mining Co., 9th Cir., 157 F.2d 876, certiorari denied; and Walling v. Alaska Pacific Consolidated Mining Co., 9th Cir., 152 F.2d 812, certiorari denied. The Supreme Court has repeatedly pointed out that the regular rate must be the quotient of the amount actually paid divided by the number of hours actually worked; that it must be the actual, not fictitious, rate agreed upon and paid. Concerning such an arrangement as that here involved, it was said in Walling v. Helmerich & Payne, supra, 323 U.S. pages 41, 42, 65 S.Ct. 14, 89 L.Ed. 29:

"The vice of respondent's plan lay in the fact that the contract regular rate did not represent the rate which was actually paid for ordinary, non-overtime hours, nor did it allow extra compensation to be paid for true overtime hours. It was derived not from the actual hours and wages but from ingenious mathematical manipulations, with the sole purpose being to perpetuate the pre-statutory wage scale.

"It is no answer that the artificial regular rate was a product of contract or that it was in excess of the statutory minimum. The Act clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employ-

er and employee, provided that the statutory minimum is respected. But this freedom of contract does not include the right to compute the regular rate in. a wholly unrealistic and artificial manner so as to negate the statutory purposes. Even when wages exceed the minimum prescribed by Congress, the parties to the contract must respect the statutory policy of requiring the employer to pay one and one-half times the regular hourly rate for all hours actually worked in excess of 40. Any other conclusion in this case would exalt ingenuity over reality and would open the door to insidious disregard of the rights protected by the Act."

The uncontradicted testimony is that this arrangement was merely a bookkeeping device and, hence, it was ineffective to establish a new contract or change the existing regular rate. Walling v. Halliburton, 331 U.S. 17, 23, 67 S.Ct. 883, 91 L.Ed. 1088; Madison Avenue Corporation v. Asselta, 331 U.S. 199, 204, 67 S.Ct. 1178, 91 L.Ed. 1432; Walling v. Harnischfeger Corporation, 325 U.S. 427, 430, 432, 65 S.Ct. 1246, 89 L.Ed. 1711; Walling v. Hardwood Co., 325 U.S. 419, 423, 426, 65 S.Ct. 1242, 89 L. Ed. 1705; Walling v. Helmerich & Payne, supra, 323 U.S. at page 42, 65 S.Ct. 11, 89 L.Ed. 29; Overnight Motor Co. v. Missel, 316 U.S. 572, 579, 580, 62 S.Ct. 1216, 86 L. Ed. 1682; Watkins v. Hudson Coal Co., 3 Cir., 151 F.2d 311, 317, 319; Carleton Screw Products Co. v. Fleming, 8 Cir., 126 F.2d 537, 541; Seneca Coal & Coke Co. v. Lofton, 10 Cir., 136 F.2d 359, 361; Murray v. Noblesville Milling Co., 7 Cir., 131 F.2d 470, 472, certiorari denied 318 U.S. 775, 63 S.Ct. 832, 87 L.Ed. 1145.

■ Part of the overtime claimed by plaintiff consists of time allegedly worked on emergency jobs after the regular day ended. To differentiate it from regular overtime it was referred to throughout the trial as special overtime. In common parlance, plaintiff was a "trouble-shooter." The testimony on this phase of the controversy is somewhat difficult to reconcile. Plaintiff testified that he was constantly called at night, to facilitate which the company installed a telephone in his quarters; that after putting in such overtime he would report it on the following day to the time-keeper, that the timekeeper said little or nothing and for all that appears the timekeeper might have thought it was mere make-talk, that when plaintiff complained to the timekeeper that he had not been paid for such overtime for the preceding pay period the timekeeper would make some indefinite or ambiguous remark as that he would see to it or take care of it. Plaintiff's wife corroborated plaintiff, and further testified that she kept a record of this overtime on a calendar from the beginning of plaintiff's employment because plaintiff had not been paid overtime due him in his previous employment. In accounting for the nonproduction of the calendars plaintiff and his wife testified that after plaintiff and his attorney had compiled an exhibit from the calendars for the purpose of instituting this action and had answered her question, as to whether they were through with the calendars, in the affirmative, she thought they meant that they were not only through with them so far as preparing the complaint is concerned but for all time and, hence, destroyed them. The circumstance that plaintiff was the only employee in whose quarters a phone was installed tends to corroborate his testimony that he was frequently called at night to repair machinery which broke down.

The timekeeper testified that he had acted as such for defendant and its predecessor for twenty-two years. He admitted that plaintiff might have informed him that he had worked overtime at night, but that he was not authorized to credit any employee with overtime unless it was turned in by the foreman or the general manager, that no such time was turned in for plaintiff, and that, while plaintiff might have complained to him that he had not been paid for an hour or two of overtime without his recalling it at the time of trial, he was positive that if plaintiff had claimed any considerable amount of overtime he would recall it.

Plaintiff was not questioned concerning his knowledge of the existence of the rule, but if he persisted in reporting overtime to the timekeeper the presumption is that he was ignorant of it. The testimony is similarly silent as to whether the general manager or the foreman was called every time

plaintiff was called, but plaintiff's wife testified that occasionally the general manager himself would call plaintiff, and in any event it is unlikely that there could have been a major interruption without one of them being apprised of it either at the time it occurred or the next day and, hence, it must be presumed that, if breakdowns occurred, they had knowledge that the defendant worked on such occasions and, in view of the timekeeper's testimony that the general manager or foreman would go over the time sheets daily, that no overtime was turned in for such work. Plaintiff was not recalled in rebuttal, and the testimony of the timekeeper, as to the rule governing the manner of reporting overtime, stands undenied, except perhaps as it may be rebutted by the circumstances. On the other hand the testimony of the plaintiff as to night work was not contradicted by the testimony of those who presumably had actual knowledge—the general manager, the foremen and those employees who worked with or near plaintiff when he worked nights. Plaintiff, however, made no complaint to the general manager or his foreman concerning nonpayment of this special overtime. He and his wife would justify this conduct on the ground that on August 13, 1940, when they called the general manager's attention to the fact that the reduction in the basic rate from $6 to $5.25 was in violation of the Fair Labor Standards Act and that plaintiff was "going after" the overtime due him, he threatened to fire and black-list plaintiff, and they concluded it was futile to make any further demand and that plaintiff's only recourse was to sue.

Defendant was not able to produce its time records but, notwithstanding plaintiff's insinuations, it is not perceived how such records would have been of any assistance to plaintiff since, in view of defendant's defense that, if such overtime was put in, it was not reported to the foreman or general manager in accordance with defendant's practice, the time sheets would not show such overtime. It appears that after all operations ceased the books of the defendant were brought to Juneau and later taken by the president to Seattle and that after his death they could not be found. In view of the fact that, although the suit was filed in 1941, it was not tried until July, 1948, and that in the meantime the general manager also died, it is not surprising that something of this kind occurred. If plaintiff worked nights as claimed, he is of course entitled to compensation regardless of whether either he or his employer kept a record of it. Viewing the evidence in its entirety, I find that the plaintiff has sustained the burden of proof on this issue. George Lawley & Son Corporation v. South, 1 Cir., 140 F.2d 439, 151 A.L.R. 1081; DePasquale v. Williams-Bauer Corporation, 2 Cir., 151 F.2d 578; Bloch v. Bell, 6 Cir., 152 F.2d 962.

The final question is whether liquidated damages should be allowed in view of Section 11 of the Portal-to-Portal Act, 61 Stat. 89, 29 U.S.C.A. 260, providing that:

"In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."

Defendant closed its mine in November, 1938. After an internal reorganization it engaged in exploratory work for several months which was fruitless. Operations thereafter were limited to the recovery of gold from the tailings. It is uncontradicted that at least since November, 1938, defendant's operations were unprofitable and that they were permanently discontinued in April, 1941. Much uncertainty and confusion existed as to the scope and applicability of the Act, and it was not until April 23, 1942, that it was held, Holland v. Haile Gold Mines, D.C., 44 F.Supp. 641, that gold mining was within the terms of the Fair Labor Standards Act. In the meantime the company attempted in good faith to comply with the Act. In view of the un-

certainty referred to, it is not surprising that in making such changes as were deemed necessary to comply with the Act, the company was influenced by the practices of the industry or the larger operators. Its good faith in this respect must be determined in the light of such practices and the opinions entertained by the industry rather than in the light of subsequent events. I find that the company had reasonable grounds for believing that the Poxon Plan was lawful, and that its omission to pay regular and special overtime to plaintiff was due to its belief in the one instance that no overtime was due and in the other, to the failure of the plaintiff to demand compensation for the special overtime claimed. Accordingly, I find that defendant's omission to pay was in good faith and that, therefore, liquidated damages should not be allowed. $350 is allowed for attorney fees.