James P. MITCHELL, Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

Ralph ADAMS, doing business as Macon
Shirt Company, Defendant.
Civ. A. No. 1164.

United States District Court,
M. D. Georgia, Macon Division.

March 3, 1955.

378

Beverley R. Worrell, Regional Atty., U. S. Dept. of Labor, Birmingham, Ala., for plaintiff.

C. Baxter Jones, Macon, Ga., for defendant.

BOOTLE, District Judge.

This is an action by the Secretary of Labor seeking an injunction against Ralph Adams, doing business as Macon Shirt Company, for alleged violations of the minimum wage, overtime compensation, record-keeping and the shipping provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. At a pretrial conference it was agreed that the only issues in controversy concerned whether the defendant violated the monetary, record-keeping and shipping provisions of the Act in question, and whether or not an injunction should be granted.

The case involves three groups of employees, the sewing room employees, the office employees and the Belo contract employees. This memorandum opinion will deal with them in the order named.

Sewing Room Employees

The complaint here is that some of these employees were paid less than 75¢ per hour and that some of them were not compensated for overtime hours at rates not less than one and one-half times the regular rate.

The defendant propounded Interrogatory No. 1 as follows:

"State the name and job classification of each and every employee of defendant with respect to whom it is contended that during the period since November 18, 1951 the defendant repeatedly has violated, and is violating, the provisions of Sections 6 and 15(a)(2) of the Act by paying to such employee wages at rates of pay less than 75¢ per hour."

To this interrogatory the defendant replied substantially as follows: The scheduled hours of work in sewing room were from 8:00 a. m. to 12:00 noon, and from 12:45 p. m. to 4:45 p. m., five days a week for a total of 40 hours a week; that all employees in this department were paid on a piece rate basis; that the electric power feeding the sewing machines was turned on before 8:00 a. m. and was left on during the lunch period between 12:00 noon and 12:45 p. m.; that "Many of the employees in the sewing room habitually commenced working when they arrived at the establishment which varied from 10 to 15 minutes of 8:00 a. m. and would work a portion of their lunch period, usually returning to work before 12:45 p. m., some as early as 12:25 p. m."; that plaintiff did not have information sufficient to answer the interrogatory with desired specificity, but stated that substantially all of the sewing room employees, at one time or another, engaged in such "off-the-clock" work; that this practice was one of long standing and from ¼ to ⅓ of the employees, different ones at different times, were constantly engaged in such practice, and concluded with the statement: "Among those so engaged were Shirley F. Brown, Selma R. Brown, Elizabeth Davis, Ida B. Godfrey, Myrtice Howard,

Louise Stanley and Lizzie Ward, but as heretofore stated the practice pertained to many more employees in the sewing room department."

By Interrogatory No. 3 defendant inquired specifically whether plaintiff contended that any employee was paid less than 75¢ per hour and worked longer than 40 hours without being compensated for overtime as required by the Act. The plaintiff replied that many of the sewing room employees, by reason of the practice of working off-the-clock, would work in excess of 40 hours a week, and were paid the straight time rate only for the number of recorded hours.

With respect to the 75¢ minimum rate plaintiff contends that there was a violation in those cases, if any, where the employee was compensated at the minimum rate, since they were paid at the minimum rate for only 8 hours, and that with respect to overtime employment there was a violation even if the piece rate compensation was substantially more than the minimum hourly rate.

The seven employees specifically named by plaintiff in answer to the above mentioned interrogatory were in court in response to plaintiff's subpoenas. Lizzie Ward, one of the seven, was not used as a witness and the only testimony about her was from Selma Brown, who testified to the effect that Lizzie Ward had worked some off-the-clock. The other six sewing room employees testified in substance as follows:

Louise Stanley on direct testified that she usually gets to work 5 or 10 minutes before 8:00 a. m. and starts to work; most of them begin before 8:00 a. m.; in repair work they sometimes begin before 12:45; as far as she knew this off-the-clock work had been going on for 8 years; the supervisors had always told them not to do it; some employees had said the supervisors tried to stop it. This work stopped after July, 1954. (The second visit of the Investigator, after his first visit in November, 1953.)

On cross she testified that the warning bell rings at 7:55 a. m. and 12:40 p. m. In the morning she usually arrives at warning bell time; some employees get there after warning bell time; some employees do their own sewing on company machines. The reason she said others were working when she arrived is because she just saw them at their machines. She goes to lunch with her husband, who works at a nearby plant, and it usually takes them the full 45-minute lunch period. She is a high wage rate employee making much more than the 75¢ minimum hourly rate.

Elizabeth Davis on direct testified that she worked in the sewing room from September, 1944 to April, 1954; is off now because of no work; when she didn't make the "dozens" they caught up her pay, but she usually made more than 75¢ per hour; she came to work by bus, which usually got there 15 or 20 minutes before 8:00; she started to work "not usually" before 8:00; she lunched at lunchroom in the building and got back to sewing room about 12:30 or 12:25 and sometimes talked, sometimes repaired and sometimes did regular work; some brought their own personal work with them.

On cross she testified that she came to work by bus and got there most of the time after the warning bell; rarely before 8:00 a. m. and sometimes did repairs; she was usually back in the sewing room by 12:30 and started to work just occasionally before 12:45.

Shirley Brown on direct testified that she worked two months in the fall of 1953; was paid "make-up" each week; left home about 7:40; was usually 8:00 before she got there; would see some working there 20 or 25 minutes; saw no efforts to stop off-the-clock work, but there could have been such efforts; didn't know whether the Supervisors ever saw her work off-the-clock.

On cross she testified that she got there most of the time just at the bell; her off-the-clock work would amount to not more than 20 minutes in all during the time she worked there.

Ida Godfrey on direct testified she worked there since June 28, 1947; got

to work sometimes 5, sometimes 10 minutes before 8:00; sometimes would crochet, talk, do repairs or start to work; she started to work "just occasionally" before 8:00 and "just occasionally" before 12:45; others could have been doing their own work; has done a little of her own sewing on her grandson's shirts; her estimate is that her off-the-clock work would not exceed an hour in any week—"not very much".

On cross she testified that she " 'spects" it has amounted to an hour in a whole week, but not often; she was stopped from work several times and was repeatedly told not to do it, but was "just stubborn"; at times she worked before 8:00 a. m. and during lunch period by request, for which she received compensation; she made much more than 75¢ an hour.

Myrtice Howard on direct testified that she worked there since June, 1944; was dropped off at plant at various times between 7:30 and 7:45; would get up material and get straightened out before 8:00 a. m.; would be there at warning bell; the company had let her work before 8:00 a. m. when she was getting off early in the afternoons to visit the doctor.

On cross she testified that she made production; did not work over eight hours in a day or overtime in any week without being credited and paid for it.

Selma Brown on direct testified that she came by bus and got there about 7:45 or 7:50 a. m.; sometimes would clean up machine or start sewing; would finish lunch by 12:30 and would then work or talk; could not estimate whether or not this off-the-clock work would amount to as much as "an hour" during the week; the floor lady told her not to work; the men told her not to work; about June of this year this off-the-clock work stopped; we knew it was wrong, the Investigator was not there when it stopped.

On cross she testified that she knew the company did not want them to work; she would not take the break period; knew that if she did she would drink a Coca-Cola.

The defendant's testimony and that of Mr. Usina, his General Manager, and Mr. Clay, his Production Manager, showed that the defendant was opposed to and repeatedly forbade any off-the-clock work. This plant manufactures a high quality shirt and constant supervision of employees was necessary and desired. The employer desired his employees to be free from fatigue and provided 10 minute rest periods, both morning and afternoon, and all employees were urged to take advantage of these rest periods. The piece rates were set up so as to enable the employees to earn, with their production bonuses, approximately twice the 75¢ minimum.

These sewing room employees numbered from a very few in slack times to around 200 or more in busy times. With 200 machines and 200 women in one room, with many employees having the freedom of the entire area upon arrival before 8:00 a. m., there was likely a lot of visiting and considerable talking. It is unlikely that anyone knew exactly what the others were doing, unless special attention was paid. If a machine was running there may have been a mechanic working on it, or the operator may have been working on his own personal work, or it may have been permitted and credited work.

The Investigator, Mr. Stern, testified that on one occasion while downstairs in the office he heard some machines start up around 12:25 to 12:30. He did not at that time investigate, but assumed that some operators were returning to work and from the increasing noise assumed that others were later starting their machines. On another day he was in the sewing room shortly before 12:45 and saw several at work and talked with them about it. From downstairs he could not tell from the sound how many machines were running, or whether it was permitted and credited work, or whether the machines were being tested.

For 105 of the 139 weeks beginning with week ending November 24, 1951 and ending with week ending July 24, 1954, production reports were prepared

by the defendant. In the remaining 34 weeks there was no production or not enough to justify the preparation of a report. In 74 of the reported 105 weeks these sewing room piece rate employees were credited with overtime hours in varying amounts each week, totaling 6,386 hours, or an average of 86 plus overtime hours per week.

### Findings of Fact and Conclusions of Law with Respect to Sewing Room Employees

 I find that such off-the-clock work as was done by sewing room employees was done without the consent and contrary to the wishes and instructions of the defendant, and that the defendant in no way connived it or winked at it, and did not acquiesce in or tacitly assent thereto. Such work had stopped, prior to the filing of this suit. I find that some off-the-clock work was done by a small number of sewing room employees. Only 6 out of a possible 200 or more testified. The evidence does not convince that such work was engaged in by any substantial number of the employees. Such others as were seen by any of the six testifying to be at their machines during off-the-clock period may well have been doing personal work. I find that as to Louise Stanley the maximum off-the-clock work would be 25 minutes per week; as to Elizabeth Davis, I am unable to find that she did any off-the-clock work; as to Shirley Brown, I find that her off-the-clock work would not exceed more than 20 minutes during the 2 months employment; as to Ida Godfrey, I find that she did some off-the-clock work, but it would not amount to more than 1 hour in any week; as to Myrtice Howard, I find that she did not work any time for which she was not credited and paid; as to Selma Brown, I find that she did some off-the-clock work, but since she could not say that it amounted to as much as an hour during any week, I find that it did not exceed 1 hour during any week.

I find that this off-the-clock work was of such short duration, was so sporadic and infrequent that it is negligible and factually too minimal to be taken into consideration.

I conclude as a matter of law that the defendant is not liable to the sewing room employees for such off-the-clock work. Tobin v. Alma Mills, 4 Cir., 192 F.2d 133; Walling v. Crown Overall Mfg. Co. (D.C., S.Ohio) 9 Labor Cases, Par. 62,655; Ortiz v. San Juan Dock Co. (D. C., Puerto Rico) 10 Labor Cases, Par. 62,789. This case differs from Kappler v. Republic Pictures Corp., D.C., S.D. Iowa, 59 F.Supp. 112, 113, in that there a responsible official of the employer not only knew of the overtime work, but "in fact co-operated with the plaintiff in his overtime work".

I conclude as a matter of law that this off-the-clock work is of no consequence and is governed by the rule "de minimis non curat lex". Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515; Anderson v. Mt. Clemens Pottery Co., D.C.E.D.Mich.S.D., 69 F. Supp. 710.

> "Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692, 66 S.Ct. 1187, 1195, 90 L.Ed. 1515, 1525.

The reasonableness of the above quoted rule is apparent when we remember that those employees who started early one morning may have started late the next morning, and as many or more employees may have started late as early. In the Mt. Clemens Pottery Co. case, supra, the Supreme Court approved the findings of the master, "that productive work did not begin before the scheduled hours except in a few instances which were counterbalanced by occasions when work began after the scheduled hours or ended before the schedule cessation of productive work."

#### Office Employees

█ This issue involves 4, occasionally 5 or 3, clerical office employees. The defendant contends that they were individually and bona fide employed for a regular work week of 44 hours, 8 hours each Monday through Friday, and 4 hours Saturday, at a stipulated regular hourly rate greatly in excess of 75¢ for 40 hours, and time and one-half the regular rate for hours in excess of 40. Mr. Usina so testified, and testified that he made the agreements with each of these employees.

The plaintiff agrees that an employer can validly pay an employee on a salary basis so long as that salary includes overtime premium based on at least one and one-half times the regular rate for all hours worked in excess of 40, but insists that here we do not have that situation. The plaintiff contends that as a matter of actuality agreements were made with these office employees, to pay them straight weekly salaries and since the usual work week called for 44 hours, "a fictitious hourly rate was established by a boosted hour method, that is, by dividing the salary agreed upon by 46, and resulted only in 'bookkeeping' compliance with the law". Plaintiff says further in his brief, "We do not deny defendant's right to contract for a weekly salary based on a bona fide regular rate for a regular workweek. Our complaint in this case is that that was not done". Plaintiff says that defendant's argument is bottomed on an erroneous premise—an assumption that these employees have always worked a uniform number of hours each week, with the exception of excusable absences and insists that at least up to the Investigator's first visit in November, 1953, these employees at times varied from normal schedule and yet always received the same weekly salary. Plaintiff's reply brief summarizes his contentions as follows: "Fundamentally it is a factual question rather than one of law."

Plaintiff emphasizes the fact that for a few weeks in the early part of 1952 all of these office employees were ex- cused on Saturdays, and in the summer of that year for 7 successive weeks a part were excused on Saturdays. After the Investigator's visit in November, 1953, there was an additional period in 1954, until September of that year when a part of these employees were excused on Saturdays. Plaintiff contends that these absences were not occasional within the meaning of Section 7(d) (2) of the Act, or within the meaning of the following statement from C.C.H.Labor Service, Par. 25,560.20:

> "Employees working fixed hours for a fixed salary may be paid the usual fixed amount during occasional weeks when they work fewer hours due to absences of the type enumerated in Section 7(d) (2) of the FSLA—vacation, holiday, illness, failure to supply work or other similar cause, in short, those types outlined in the first listed above".

On the other hand, defendant contends that these absences are "occasional" when considered in the light of defendant's business. Mr. Usina testified, as did the office employee witnesses who testified for plaintiff, that in every instance where Saturday absences were permitted it was because there was no work requiring their presence or the presence of all of them, and that it was in each instance understood to be a temporary arrangement. The management was consistently expecting business to pick up the next week. The defendant testified that frequently business barometers predicted pickup in business.

Mrs. Dorothy Mickler, Assistant Bookkeeper, testified that she was supposed to have regular hours drawing $1.36 per hour with a regular work week of 44 hours and a total weekly pay of $62.56; that she did get overtime if she turned it in; that after the Investigator's first visit she received pay for overtime; that for a while work was slack and they rotated Saturday mornings; that this rotation was over at the time of the trial; that she knew the company was entitled to 44 hours per week and that she had got off for a few deaths in the family.

The defendant's records show the period beginning with the week ending hours worked by the office employees and November 24, 1951, and ending with their absences from work during the the week ending November 6, 1954.[1]

1. "The following is a specimen of the form and content of a week in which there were four such employees, all recorded as being present and working 8 hours each day Mondey through Friday, and 4 hours on Saturday, making up the regular workweek of 44 hours:

| Name | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. | Total |
|------|------|-------|------|--------|------|------|-------|
| A | 8 | 8 | 8 | 8 | 8 | 4 | 44 |
| B | 8 | 8 | 8 | 8 | 8 | 4 | 44 |
| C | 8 | 8 | 8 | 8 | 8 | 4 | 44 |
| D | 8 | 8 | 8 | 8 | 8 | 4 | 44 |

### "First Period

"The first period summarized is the period commencing with the week ending November 24, 1951, and ending November 7, 1953, a total of 103 weeks. This period is used because the closing date coincides with the first visit of Mr. Stern, the Investigator.

"In 70 of the 103 weeks in this period all employees are recorded as being present each day of the week, working the regular hours totaling 44 hours as indicated in the specimen above. This statement disregards absences by an employee for a whole week during the summer months which are clearly shown to be a vacation week for that employee, and it also disregards absences when all employees were taking Christmas, Thanksgiving or July 4th holidays.

"The remaining 33 weeks conform with the specimen except as follows:

Week Ending

| | |
|--|--|
| 12–15–51 | One out Saturday |
| 2–2–52 | All out Saturday |
| 2–9 | All out Saturday |
| 2–16 | Three out Saturday |
| 2–23 | All out Saturday |
| 3–1 | All out Saturday |
| 3–8 | One out Monday—three out Saturday |
| 5–17 | One out Saturday |
| 6–28 | One out all week—one out Saturday |
| 7–12 | Three out Saturday |
| 7–19 | All out Saturday |
| 8–2 | Two out Saturday |
| 8–8 | Two out Saturday |
| 8–16 | Two out Saturday |
| 8–23 | Two out Saturday |
| 8–30 | Two out Saturday |
| 9–6 | Two out Saturday |
| 9–13 | Two out Saturday |
| 10–18 | One out Thursday, Friday and Saturday |
| 2–7–53 | One out Wednesday |
| 4–11 | One out 2 hours Saturday |
| 4–24 | One out 45 minutes Saturday |
| 5–16 | One out Saturday |
| 5–30 | One out Saturday |
| 8–1 | One (Margaret Hammond) out 2 hrs. Fri. & all Sat. |
| 8–8 | One out Saturday |
| 8–15 | One (Margaret Hammond) out 4 hours and balance of week |
| 8–22 | One (Margaret Hammond) out all week |
| 8–29 | One out Thursday |
| 9–5 | One out Saturday |
| 9–26 | One out 5 hours Monday |
| 10–3 | One out Saturday |
| 11–7 | Two out Saturday |

### Findings of Fact and Conclusions of Law as to Office Employees

I find that there was a bona fide agreement between the defendant and each of these office employees that the latter would work on a regular 44-hour work week basis and would be paid a stipulated regular base hourly wage rate in excess of 75¢ per hour for the first 40 hours and time and one-half that base regular hourly rate for all hours in excess of 40.

I find that they would have received time and one-half overtime had they turned it in, and that the occasional failure to pay overtime was because it was not turned in by the employees and was unintentional in so far as the employer is concerned.

#### "Second Period

"The second period covers the remaining weeks in the calendar year 1953, and is separately summarized for that reason. Except as indicated all such employees are shown to have worked 8 hours each day Monday through Friday and 4 hours on Saturday, a total of 7 weeks.

Week Ending

| | |
|---|---|
| 11–14–53 | One (Margaret Hammond) out all week |
| 11–21 | One (Margaret Hammond) out Monday, Tuesday & Wednesday—overtime recorded for 3 other employees |
| 11–28–53 | All out Thursday (Thanksgiving), one out Friday, all out Saturday |
| 12–12 | One out Thursday—three out Saturday |
| 12–19 | One out 6 hours 15 minutes Wednesday—One out 30 minutes Friday—two out Saturday |
| 12–26 | All out Thursday, Friday and Saturday—one out Wednesday (Christmas week) |

#### "Third Period

"The third period begins with the week ending January 2, 1954, and ending September 18, 1954, a total of 38 weeks. This period is used because it coincides with the period during which one or more employees were excused from Saturday work.

"During this period of 38 weeks there were 37 weeks in which one or more employees were absent on Saturday, usually two, but occasionally one and occasionally three. In the other week, making up the total of 38, all employees were recorded as present all days for the regular number of hours.

"Additional absences, other than Saturday whole days during said period are shown as follows:

Week Ending

| | |
|---|---|
| 1–9–54 | One out 1 hour and 45 minutes Wednesday |
| 1–16 | One out 3 hours and 40 minutes Thursday |
| 1–30 | One out Tuesday, Wednesday and Thursday |
| 2–20 | One out 30 minutes Saturday |
| 2–27 | One out Thursday and Friday |
| 5–1 | All out Friday (also Saturday) |
| 5–29 | One out 6 hours and 15 minutes Friday |
| 8–7 | One out Monday |
| 8–14 | One out Tuesday |

#### "Fourth Period

"This period extends from week ending September 25, 1954, to week ending November 6, 1954, the last complete week before the trial of the case, a total of 7 weeks.

"Except for overtime which is recorded all employees worked full 44 hour weeks 5 out of 7 weeks. One employee was out Saturday in week ending October 23, and one employee was out Monday in week ending October 30."

I find that when the Investigator called the defendant's attention to the fact that one or more of these employees had worked overtime and was entitled to overtime pay, such payment was promptly made.

I find that on those occasions when these office employees worked less than 44 hours and were paid as if they had worked 44 hours, such periods of reduction in hours worked were "occasional periods" and were "due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause" within the meaning of Section 7(d) (2) of the Act.

I conclude as a matter of law that these contracts of employment with office employees were valid and were authorized by the Act and the fact that these employees were not docked for their occasional absences, including those occasional absences on Saturday mornings due to the employer's failure to provide sufficient work, would not invalidate said contracts of employment. Section 7(d) (2) of the Act, C.C.H.Labor Service, Par. 25,560.20, supra; Bergschneider v. Peabody Coal Co., 7 Cir., 142 F.2d 784; Tobin v. Little Rock Packing Co., 8 Cir., 202 F.2d 234.

> "But we have no doubt that pay by the week, to be reduced by some method of computation to hourly rates, was also covered by the act. * * * No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates." Overnight Motor Transportation Co., Inc., v. Missel, 316 U.S. 572, 579, 62 S.Ct. 1216, 1221, 86 L.Ed. 1682, 1688.

> "A wage plan is not rendered invalid simply because instead of stating directly an hourly rate of pay in an amount consistent with the statutory requirements, the parties have seen fit to stipulate a weekly wage inclusive of regular and overtime compensation for a workweek in excess of 40 hours and have provided a formula whereby the appropriate hourly rate may be derived therefrom." 149 Madison Avenue Corp. v. Asselta, 331 U.S. 199, 67 S.Ct. 1178, 1181, 91 L.Ed. 1432.

### Belo Contracts

The defendant has 5 present employees with whom he has individual Belo contracts, the weekly guarantees under these contracts being $72.80, $75.60, $80.50, $91 and $95.20. Each of these contracts guarantees 60 hours per work week. One of them is a renewal of a contract which originally guaranteed 58 hours per work week. These contracts are alike except as to dates, name of employee and hourly rates. The following is a specimen:

> "Georgia, Bibb County:

> "This agreement entered into this the 3rd day of July, 1952, between Macon Shirt Company, hereinafter called the Employer, and James Land, hereinafter called the Employee;

> "The Employer agrees to employ the Employee at a regular hourly rate of pay at $1.36 per hour for the first 40 hours in any workweek and at the rate of $2.04 per hour for all hours in excess of 40 in any workweek, with the guarantee that the employee will receive, in any week in which he performs any work for the Company, the sum of $95.20 as total compensation, for all work performed up to and including 60 hours in such workweek.

> "It is further agreed that this contract may be terminated by either party hereto upon notice to the other.

> "Macon Shirt Company
> "By C. H. Usina
> "James Land
> "Employee"

There have been 12 or more of these contracts. At the request of plaintiff, defendant made certain admissions as to the employment of these employees, the content of which may be summarized as follows:

| "Name of Employee | Average Weekly Hours | Number of Weeks Employee Exceeded 60 Hours |
|---|---|---|
| J. T. Caves | 42 | None |
| Tom A. Joiner | 44–48 | None |
| Frank C. Jones | 45 | None |
| Ruth Owen | 46 | None |
| Clifford Churchwell | 48 | None |
| Harold P. Lowman | 48 | None |
| Frank B. Tidwell | 48 | None |
| Ernest Coleman | 50– | None |
| Robert Davidson | 50– | None |
| Clarence Nichols | 50– | None |
| Joseph Tucker | 50– | None |
| James Land | 50 | One |

"Defendant in his responses sets out that James E. Land worked in excess of 60 hours during the workweek ending March 21, 1953, and was paid for this overtime on the morning of the trial. Such responses further set out that the averages contained in plaintiff's requests are inaccurate and that on a mathematical basis the true averages are actually lower than those which defendant was requested to admit."

Defendant points out in his brief that this admission of a mathematical average over a lengthy period which includes extended temporary periods during which there was little or no work with 40 or less hours actually worked weekly during these periods is no indication whatever of a normal average of hours under normal conditions. While only one employee worked more than 60 hours (James E. Land worked 67 hours and 25 minutes for week ending March 21, 1953), Robert Davidson testified that he worked as much as 60 hours, and Mrs. Ruth Owen testified that she worked up to 50 hours although the above admission gives her a weekly average of 46. Several, if not all, of these employees who testified testified that upon return to normal full work conditions they would have to work more than 60 hours.

The defendant testified that from 1944 to 1949 normal production was 3,850 dozen shirts per week. Business was not good in 1949. Some weeks since 1949 not over 1,700 dozen were produced; some weeks not over 600 dozen. In May, 1950, they entered into the first Belo contracts. These contracts were agreed upon in the light of their former experience. He has consistently expected business to get better. He thought the recession of 1949 was temporary. Several times since then business has "spurted"; has looked up. This year is twice as good as last year. If the plant were in full production many of these Belo employees would work more than 60 hours per week.

The defendant contends that these Belo contracts are perfectly valid under Section 7(e) of the Act, added by the 1949 Amendment, and says that the contracts measure up to every requirement of the Section.

On the other hand the plaintiff contends that these contracts are invalid, stating their chief contention as follows:

"It has been the long-standing, consistent and published position of the Administrator of the Wage and

Hour Division that the rate specified in the contract must be the 'regular rate' at which the employee is employed and that it must actually control the amount of compensation paid. Thus a guarantee of a number of hours far in excess of the hours which the employee's employment requires, would result in a contract rate wholly artificial and fictitious in character."

If this contention be taken to mean that in no event can a Belo contract be valid unless the hours worked occasionally or with fair frequency exceed the number of guaranteed hours, this contention seems to go further than the Administrator's position as stated in Interpretative Bulletin, Part 778.18(d) and (f), Overtime Compensation Under The Fair Labor Standards Act of 1938, as Amended, (Title 29, Chapter V, Code of Federal Regulations). In Sub-Section (d) the Administrator points out that in the two cases in which the Supreme Court considered and held valid Belo contracts, Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716; Walling v. Halliburton Oil Well Cementing Co., 331 U.S. 17, 67 S.Ct. 1056, 91 L.Ed. 1312, it so happened that, "the relationship between the hourly rate specified in the contract and the amount guaranteed was such that the employee in a substantial portion of the work-weeks of the period examined by the Court worked sufficient hours to earn in excess of the guaranteed amount. * * * The fact that Section 7(e) requires that a contract, to qualify an employee for exemption under Section 7(e), must specify a 'regular rate' indicates that this criterion of these two cases is still important". One wonders here whether the Administrator is labeling "criterion" what was only a circumstance. As we read the cases the Courts have not laid down and perhaps would not be warranted in laying down a hard and fast rule to the effect that, if the number of hours guaranteed are never exceeded with a frequency and to an extent to be judicially prescribed, the con-

tract is ipso facto invalid. The Belo case was decided in 1942 and the Halliburton case in 1947. Thereafter, in 1949 Congress amended the Act and added Section 7(e). The contract in the Belo case guaranteed 54½ hours, the contract in the Halliburton case guaranteed 84 hours. It so happened that in the Belo case the employees exceeded 54½ hours in considerably less than 20% of the weeks worked, while in the Halliburton case in about 20% of the work weeks they worked in excess of 84 hours. Both contracts were held valid by the Supreme Court. The Amendment of 1949 placed a Congressional stamp of approval on this type of contract, but limited the guarantee to "not more than sixty hours". In view of the widespread publicity given to the Supreme Court's decisions in the Belo and Halliburton cases, and in view of the specific contention of the Administrator in those cases to the effect that the number of hours guaranteed bore no relation to the usual work week, if it had been the intention of Congress that the validity of such contracts should depend upon whether or not the hours worked should to a certain extent or with a certain frequency exceed the number of hours guaranteed, it would have been appropriate for Congress to have said so. Instead of saying so, however, it simply added a new requirement, to wit, that the contract must provide a weekly guarantee of pay "for not more than sixty hours".

We think the Administrator comes nearer to a proper interpretation of the Amendment in Sub-Section (f) of the Interpretative Bulletin when he says, "In order for a contract to qualify as a bona fide contract for an employee whose duties necessitate irregular hours of work, the number of hours for which pay is guaranteed must bear a reasonable relation to the number of hours the employee *may be expected to work*". (Italics supplied.) And when he says further in said Section, "In deciding the amount of the guaranty they (employer and employee) should not choose a guaranty of pay to cover the maximum number of

hours which the employee will be likely to work at any time, but should rather select a figure low enough so that *it may reasonably* be expected that the rate will be operative in a significant number of workweeks". (Italics supplied.)

These contracts must have future operation and it is the expectation of the future which should control, not a hindsight determination to be made in the future. It is not the intent of the law to deprive employer and employee of the right reasonably to hope for and expect a return to a normal volume of business and normal conditions of employment, nor to say that a contract made and executed in good faith on that basis will retroactively involve the contracting parties in difficulties if such hopes and expectations do not materialize.

## Findings of Fact and Conclusions of Law as to Belo Contracts

I find that these contracts were, and are, bona fide individual contracts entered into in good faith on both sides and were understood and agreed upon by employer and employee alike; that the duties of each of these employees necessitated irregular hours of work; that each contract was intended to, and did, fix and specify the *regular rate of pay* of each employee which rate was not less than the minimum hourly rate provided in Section 6(a) and specified also compensation at not less than one and one-half times such rate for all hours worked in excess of 40 in any work week and provided a weekly guaranty of pay for not more than 60 hours based on the rate so specified.

I find that the number of hours for which the contracts guarantee pay bears a reasonable relation to the number of hours the employees were reasonably expected to work when the contracts were entered into.

I conclude as a matter of law that each of said contracts is in accordance with Section 7(e) of the Act and is valid and that the defendant's operation thereunder, and reliance thereon, thus far has been legal. Walling v. A. H. Belo Corp.,

supra; Walling v. Halliburton Oil Well Cementing Co., supra; Tobin v. Little Rock Packing Co., 8 Cir., 202 F.2d 234; Atlantic Co. v. Walling, 5 Cir., 131 F.2d 518; Clay v. Motor Freight Express, D.C., E.D.Pa., 52 F.Supp. 948; Walling v. Lexington Roller Mills, Inc., 7 Labor Cases, Par. 61,848; Walling v. McComb, 9 Labor Cases, Par. 62,645; McComb v. Pacific & Atlantic Shippers Ass'n, Inc., 7 Cir., 175 F.2d 411; Walling v. Anderson Clayton Co., 12 Labor Cases, Par. 63,790; McComb v. Utica Knitting Co., 2 Cir., 164 F.2d 670; Beechwood Lumber Co. v. Tobin, 5 Cir., 199 F.2d 878.

I conclude as a matter of law that, this not being an action for a declaratory judgment, it is not necessary, even if it would be proper, for this court at this time to attempt an adjudication as to the validity of these contracts with respect to the future. As to the past and present, these contracts are upheld as being bona fide and as prescribing the regular hourly rate of pay in view of the reasonable expectations of employer and employees in 1951 based on actual experience as to the number of hours the ex-employees may be expected to work. It may well be that, in view of the aggregate and total experience of employer and employees under these contracts to this date including the fact that the business slump in this particular business has lasted *longer* than was expected and the fact that the reasonably expected number of hours has not been required, the parties to these contracts will now need, and desire, to revise them adjusting the guaranteed number of hours downward so as to unquestionably meet the requirements of the law that the stipulated hourly rate must not be a fictitious one and that there must be a reasonable relation between the stated hourly week and the guaranteed weekly sum. McComb v. Roig, 1 Cir., 181 F.2d 726.

## Findings of Fact and Conclusions of Law Generally

I find that the defendant's records are in every respect adequate and complete,

except only for failure to record the negligible amount of unauthorized off-the-clock work in the sewing room.

I find that no sufficient cause has been shown for the issuance of any injunction in this case.

I conclude as a matter of law that this court has jurisdiction of this case under the provisions of Section 17 of the Act, 29 U.S.C.A. § 217.

I conclude as a matter of law that under the evidence in this case and under the foregoing findings of fact no injunction in this case should be issued.

