**ASSELTA et al. v. 149 MADISON AVENUE CORPORATION et al.**

United States District Court
S. D. New York.
May 9, 1950.

Duberstein & Nimkoff, New York City (Frederick E. Weinberg, Wilbur Duberstein, New York City, of counsel), for plaintiffs.

Joseph Caine, McLanahan, Merritt & Ingraham, New York City (Robert R. Bruce, John B. Tittmann, John J. Boyle, New York City, of counsel), for defendants.

RIFKIND, District Judge.

This action under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., has already had a long career. It appears now to be well launched on another of perhaps equal duration.

The action was commenced on December 10, 1943. On November 20, 1944, fourteen days after the decision in Walling v. Helmerich & Payne, 1944, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 and by the light of that opinion, plaintiffs filed an amended complaint alleging claims under the Act for the period April 21, 1942 to December 10, 1943. These are the claims presently in issue.

Judge Bondy filed his opinion directing judgment in favor of plaintiffs on December 31, 1945. It is reported at 65 F.Supp. 385. On March 8, 1946, judgment for the plaintiffs was entered.

On review, the judgment was affirmed by the Court of Appeals, 156 F.2d 139, on June 17, 1946, and by the Supreme Court, 331 U.S. 199, 67 S.Ct. 1178, 91 L.Ed. 1432, 169 A.L.R. 1293, on May 5, 1947. Nine days later, on May 14, 1947, Congress enacted the Portal-to-Portal Act, 29 U.S.C.A. § 251 et seq. Thereupon, in response to defendants' petition, the Supreme Court made an order modifying the judgment of affirmance and remanding the cause to the District Court with authority in that court to consider Portal-to-Portal Act defenses. June 16, 1947, 331 U.S. 795, 67 S.Ct. 1726, 91 L.Ed. 1822.

Proceedings were then had in the District Court which culminated in Judge Bondy's opinion filed July 1, 1948 and reported in 79 F.Supp. 413.

On May 19, 1949, defendants served a supplemental answer pleading the defenses indicated in Sections 9 and 11 of the Portal-to-Portal Act.

The issues so presented have been tried to the court and now call for decision.

So much for the procedural history which is the prologue to the pending litigation. A brief chronology will now be presented in an effort to summarize the events from which the inferences are to be drawn which will sustain or overrule the defenses.

The plaintiffs were building service employees working in a loft building located at 149 Madison Avenue, New York City, owned by defendant 149 Madison Avenue

Corporation and managed by defendant Williams & Co., Inc. Since the entry of the original judgment plaintiffs Manne and Torra have died and their representatives have been substituted. In all negotiations relating to rate of pay, hours of work, and working conditions plaintiffs were represented by a collective bargaining agent, Local 32B, Building Service Employees International Union, A.F.L. (hereinafter called Union), and defendants by Realty Advisory Board on Labor Relations, Inc. (hereinafter called R.A.B.). It is undisputed that in resolving the issues developed upon the trial, the good or bad faith, the reliance or lack of reliance, of R.A.B. is to be attributed to defendants. Nor is there any doubt that, throughout the period under consideration, Mr. Walter Gordon Merritt was attorney for R.A.B. and that the latter relied upon his advice as to all legal matters.

The critical events really began on December 30, 1941. On that day the Circuit Court of Appeals for the 2nd Circuit handed down its decision in the Arsenal Building case. Fleming v. Arsenal Bldg. Corp., 2 Cir., 1941, 125 F.2d 278. Owners of loft buildings in New York City suddenly realized that many of them were subject to a very large liability for overtime compensation and liquidated damages under the Fair Labor Standards Act. The decision was announced in the very midst of the negotiations between representatives of the loft building owners and the Union, representing the service employees. Mr. Merritt appeared for the owners. These negotiations were being facilitated by the intervention of Hon. Arthur S. Meyer, Chairman of the N. Y. State Board of Mediation.

Among the employer representatives on the negotiating committee was Leon Spear, one of the defendants in the Arsenal case. When the "Meyer formula" [1] was presented as a solution of the problem presented by the Arsenal decision, he said, "Now, gentlemen, this formula may be all right, but unless you go to the Wage and Hour Department here and get an approval of it, I for one will not go along with anyone that has to do with it." The context of this statement appears in the margin.[2]

---

1. See 149 Madison Ave. Corp. v. Asselta, 1947, 331 U.S. 199, 202, 67 S.Ct. 1178, 91 L.Ed. 1432, 169 A.L.R. 1293, for a description of the formula.

2. "Q. Will you tell the Court, to the best of your recollection, regarding the meetings of your negotiating committee, immediately following the decision in the Arsenal case, tell us what happened at those meetings? A. Well, we got a telephone call from Mr. Meyer, who was the chairman of the Mediation—the State Mediation Board, to assemble at his office, and we were all there, both our people, representing the owners and the union.

"And when we were all assembled, he said, 'Gentlemen, the bombshell has been thrown into this whole situation. The decision of the Circuit Court of Appeals has changed the whole aspect of this whole collective bargaining agreement that we were about ready to make.'

"He said, 'I am sure that'—and he turned to Dave Sullivan, the president of the union, and said, 'I am sure you don't mean to tax the owners twice, once in an increase in the wages and, secondly, in additional pay as a result of this decision?'

"And Sullivan said, 'No, it isn't our intent. It is too bad it has happened.'

"And Arthur Meyer then said, 'Yes,' he says, 'it is my opinion too, that when we agreed on giving you this ten per cent increase it wasn't meant that you were both to get the ten per cent increase and some additional pay because of this decision, so that this whole situation takes on an entirely different picture.'

"Q. This is Arthur Meyer's statement? A. Arthur Meyer speaking. Then, of course, there were a lot more in the room and there was a lot of discussion and a lot of talk, and after a while there was order restored.

"After order was restored the attorneys, Mr. Merritt and Mr. Clifton, Mr. Merritt's assistant, and Mr. Cohen, and I think there was Harold Berg—I am not sure now—and Mr. Meyer got into a huddle around Mr. Meyer's desk. It was a very large room and we were all sort of set apart, and they discussed many things, I presume.

"And then he turned to us and said, 'Something has to be done to correct this situation.'

"Then Mr. Merritt got up and he said, Well, after much discussion,' he says, 'I would like to make this suggestion:

Spear testified that at the very next meeting of the negotiating committees, Mr. Meyer reported that he had visited the Wage and Hour Division and that he had received its "go-ahead". Mr. Meyer's status was, at some point during the negotiations, changed from that of mediator to arbitrator and the agreement finally arrived at, which I shall call the Meyer agreement, was reduced to the form of an arbitration award. It contained the Meyer formula.

It should be underscored that plaintiffs were not employed under this agreement, which related chiefly to buildings in the garment center in New York, but under a later agreement relating to other loft buildings, including the one owned and managed by defendants. The above events relating to the Meyer agreement are relevant because substantially the same negotiating parties were involved in the later agreement under which plaintiffs were employed, which I shall call the National War Labor Board (N.W.L.B.) agreement, and because the Meyer formula was incorporated into that later agreement.

The background of the N.W.L.B. agreement is as follows: On May 1, 1942 the Secretary of Labor certified to the N.W. L.B. that a dispute which warranted its attention had broken out between R.A.B. and the Union. The plaintiffs and defend-

I was in a case representing the Anthracite Company, the coal people, and they worked out a formula which I think would pretty nearly fit our situation here.'

"And then the lawyers got together again, and he started explaining this formula, and they discussed it and talked about it, and I don't remember now whether that very day Mr. Merritt brought this formula in or whether it was at a meeting that was held very shortly after, but, at any rate, Mr. Merritt showed him this formula. They discussed it for a long time—by 'they' meaning the attorneys for the union and the attorneys for the owners and Mr. Meyer, and they—Mr. Meyer finally said, 'Well, I think this might work.'

"Then they turned to us and explained this formula to us.

"Q. Just at this point, do you recall when the Arsenal decision came down, the date? A. The decision came down, I think it was either the day before New Years—

"Q. The end of 1941? A. The latter part of December.

"Q. Does that refresh your recollection as to the length of the period over which this discussion took place? You seemed to be in some doubt as to whether it all took place on one day. A. Well, except that there were so many meetings that I can't tell you just which day it was. There were a long series of meetings. Some of them would start at 10 in the morning and finish at 6 in the evening. There was a long series of meetings all during the first part of January. To spot the very day that this particular meeting was, I don't know, but it was the very first meeting, of course, after the decision, after the ques-

tion of the bombshell having been thrown into the hopper, but then there were these series of meetings out of which came the Meyer formula.

"Q. Finally, there was a draft on the table then, I take it, of a contract or provision designed to deal with the situation created by the Arsenal case?

"Mr. Weinberg: May I ask that counsel not lead the witness in this testimony, please?

"The Court: Very well.

"A. Mr. Merritt brought a copy of the formula of the Anthracite Coal, and then after they had discussed it at length, then they explained it to us.

"Q. Both the union and employer representatives? A. That's correct.

"Q. In the presence of Arthur Meyer? A. In the presence of Arthur Meyer. As a matter of fact, Arthur Meyer was taking part in all of this—he was a mediator as well as being an arbitrator. He was on both sides all the time explaining to everybody everything.

"Then Mr. Merritt said in connection with that Anthracite formula that the Philadelphia Wage and Hour Board had given its approval or something like that.

"Then I got up and said, 'Now, gentlemen, this formula may be all right, but unless you go to the Wage and Hour Department here and get an approval of it, I for one will not go along with anyone that has to do with it.'

"Q. You said that to the whole group? A. I said that to the whole group.

"Q. Including Mr. Meyer? A. And Mr. Clifton and the union and everybody. And Mr. Meyer said, 'Well, I think you are right.' And that was the end of that meeting. * * * "

ants in this action were involved in that dispute. The N.W.L.B., which had been created by Executive Order No. 9017, 50 U.S.C.A.Appendix, § 1507, note, designated a Panel which held hearings and made recommendations to the N.W.L.B. The latter made an order on July 29, 1942 which substantially adopted the Panel's recommendations.

On the basis of that order the R.A.B. and the Union entered into an agreement on September 1, 1942—the N.W.L.B. agreement—covering the period April 21, 1942 to April 20, 1945. In due time (September 26, 1942), the defendants herein adhered thereto. It is established that the payments made to plaintiffs were in compliance with that agreement.

A few additional entries relating to the activity of Government agencies subsequent to the agreement may be added to our chronology: During the summer and fall of 1942 the Wage and Hour Division was inspecting loft buildings in New York to secure enforcement of the Fair Labor Standards Act in the light of the Arsenal decision. On November 10, 1942 the injunction decree in the Arsenal case was entered.

On December 3, 1942 N.W.L.B. issued a supplementary wage authorization in the case involving the R.A.B. and the Union, on which the order of July 29, 1942 had issued. This supplementary authorization was conditioned so as to comply with Executive Order 9250, made on October 3, 1942, 50 U.S.C.A.Appendix, § 901 note, which prohibited wage increases except as therein provided.

On February 16, 1943 an arbitrator authorized an increase of $1.50 a week under the Meyer agreement. This was reduced by the Regional W.L.B. to $1.40.

On June 21, 1943, an arbitrator awarded an increase of $1.40 a week under the N.W.L.B. agreement and that was approved by the Regional W.L.B.

The Wage and Hour Division did not attempt to collect any additional compensation under the Arsenal decision for the period after April 20, 1942, the effective date of the N.W.L.B. agreement. Nor did the Division ever attempt to enforce payment of additional wages from the Arsenal building itself through use of the contempt power which it could invoke under the injunction decree.

### 1. Section 11

▇ I have concluded that defendants have established "to the satisfaction of the court" that the omission to pay the additional compensation was in good faith and that they "had reasonable grounds for believing" that the omission was not a violation of the Fair Labor Standards Act. A defense under Section 11 of the Portal-to-Portal Act is therefore established. 29 U.S.C.A. § 260.

The uncontradicted evidence leads almost irresistibly to this conclusion. The employers had just had their fingers badly burned by their wrong guess concerning the applicability of the Fair Labor Standards Act to their employees. They faced a very large liability not only for additional compensation but for liquidated damages and counsel fees. They were negotiating a new contract. It was but natural that they would be deeply anxious to avoid that kind of pitfall again. Spear's testimony, referred to earlier in this opinion, has, therefore, the hallmark of the true and sincere. It has not been contradicted. Moreover, the best evidence of what Meyer reported to the negotiating committee is that they adopted the Meyer formula. Unless he had reported that he had been given the "go ahead" signal, it is most unlikely that the employers would have accepted the risk—certainly not without further and different pressures which do not appear to have been applied.

From this point of view, it matters little that the advice given to Meyer by the representative of the Wage and Hour Division may have contained some cautionary language.

I base my finding of good faith much more on the Meyer incident than on Merritt's earlier conversation with Dorsey, an employee of the Wage and Hour Administration in Philadelphia, concerning a similar formula used in the anthracite coal dispute.

Plaintiffs' attack on defendants' good faith and on the reasonableness of defendants' belief that the Act was not violated, is essentially grounded in quicksand. They would have me find that Merritt deliberately closed his eyes and ears in order to avoid a challenge to his good faith and to the reasonableness of his belief—an argument which attributes to Merritt foreknowledge in 1942 that in 1947 Congress would pass the Portal-to-Portal Act and incorporate therein good faith and reasonable belief as a defense. This is, of course, preposterous. But even if plaintiffs' contention were not preposterous it would still be pointless. For the issue is not the belief and good faith of Merritt but of the defendants. Assuming that Merritt entertained some doubts as to the validity of the Meyer formula, they were not communicated to the clients. Cf. Haywood Lumber & Mining Co. v. Commissioner, 2 Cir., 1950, 178 F.2d 769. Moreover, the fact that Merritt may have regarded the formula as a convenient device for mitigating the impact of the Act, by no means leads to the inference that he did not propose the formula in good faith; still less does it imply that his clients did not believe in the validity of the formula. R.A.B. acted in good faith and upon reasonable grounds and therefore defendants acted in good faith and upon reasonable grounds.

That also disposes of the argument that defendants should have been warned by the Belo brief filed by the Administrator in March, 1942. Assuming that the Belo brief should have worried Merritt, it does not appear that R.A.B. was ever apprised thereof. Nor for that matter does the record disclose when Merritt read that brief. Furthermore, now that I have read the brief, even with the aid of the hindsight derived from the decisions rendered since 1942, I still cannot say with assurance that Merritt should have been stirred into serious doubt. Indeed, the experienced attorneys for the Union were not stirred into doubt until November 1944, when the Supreme Court wrote Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29.

The defendants have successfully established a defense under Section 11 of the Portal-to-Portal Act.

## II. Section 9

Whether defendants have sustained their burden of proof under Section 9 of the Portal-to-Portal Act is a more difficult question. In order to have the benefit of that section, defendants must prove that their omission, prior to the enactment of the Portal-to-Portal Act, to pay wages in accordance with the command of the Fair Labor Standards Act was "in good faith in conformity with and in reliance on any administrative * * * order, * * * approval, * * * of any agency of the United States, or any administrative practice or enforcement policy * * * with respect to the class of employers to which he belonged". 29 U.S.C.A. § 258.

Defendants seek to prove reliance on the action of the N.W.L.B., which the parties have stipulated is an agency within the meaning of Section 9, and on the enforcement policy of the Wage and Hour Administration. The broad sweep of the defense provided by Section 9 is better grasped by comparing it with Section 10. The latter, dealing with excuse of violations occurring after the Portal-to-Portal Act, limits effective reliance to *written* regulations, orders, etc. and these only if made by specified agencies. 29 U.S.C.A. § 259.

To get to the root of the question without elaboration, the problem is this: Did the N.W.L.B. take action which should be considered an administrative order or approval, and did the defendants shape their conduct in reliance thereon?

The Panel recommended that the drafting of provisions respecting hourly rates be referred back to the parties "with the understanding that they desire to follow the comparable provisions of the Meyer Agreement". The Panel commented in Appendix B of its report: "In leaving the matter to direct negotiations, however, the Panel wishes to make it clearly understood that it considers both parties bound to accept

**448**

the principles of the Meyer Agreement formulae without change." The N.W.L.B. in its Directive Order of July 29, 1942, adopted the unanimous recommendations of the Panel.

In any common sense view of the matter, this constitutes an administrative order or approval relating to use of the Meyer formula.

Had this action of the N.W.L.B. been the product of reflection on the validity of the Meyer formula, it could hardly have been doubted that defendants would have established reliance. However, it is argued that the N.W.L.B. did not really put its mind to the problem for at no time was either the Panel or the Board made aware of any doubt of validity. Clearly the decision of N.W.L.B. is of the kind which would not constitute authority for the validity of the formula. But that is not the issue. The question is whether the defendants shaped their conduct in reliance upon the N.W.L.B. order. To that question the answer must be in the affirmative. It may well be true that both employers and employees had sufficient faith in the validity of the Meyer formula not to focus attention upon it. That, however, does not detract from the fact that the agreement containing the Meyer formula was entered into after the intercession and under the mandate of the N.W.L.B. By responding to the Directive Order and making and conforming to the contract prescribed thereby, the defendants were "relying" on the order or approval of an administrative agency. It matters not whether the N.W.L.B. professed to pass judgment on the compatibility of the formula with the Fair Labor Standards Act. It may be noted, however, that in this case the inference of reliance is strengthened by the circumstance that the N.W.L.B. is an agency which by the instrument of its creation was forbidden from trespassing on the Fair Labor Standards Act. Executive Order No. 9017, 50 U.S.C.A.Appendix § 1507 note.

I conclude that defendants have established reliance.

The good faith of the defendants has already been discussed with respect to the Section 11 defense. That they acted in good faith when conforming to and relying on the order of the N.W.L.B. is indisputable.

The enforcement policy pursued by the Wage and Hour Division can not be said to have been relied upon in originating the practice complained of. It did serve, however, as a basis of reliance for its continuance.

I conclude that defendants have established a defense under Section 9. Consequently, in compliance with the command of the statute, the defendants are not subject to "any liability" and the judgment must go for defendants.[3]

---

3. The parties have reserved the issue whether, regardless of the decision on the merits, the defendants are liable for counsel fees already assessed or to be newly assessed. I do not pass upon that question.