HOSPITAL ASSOCIATION OF NEW YORK STATE, INC., Misericordia Hospital Medical Center, Buffalo General Hospital, the Genesee Hospital, and the Mount Sinai Hospital on behalf of themselves and all other nonprofit hospitals which are members of the Hospital Association of New York State, Inc. and which are reimbursed for Medicaid services rendered to hospital patients, Plaintiffs,

v.

Philip L. TOIA, as Commissioner of Social Services of the State of New York, Robert P. Whalen, as Commissioner of Health of the State of New York, Peter Goldmark, as Director of the Budget of the State of New York, Hugh L. Carey, as Governor of the State of New York, and David Mathews, as Secretary of the U. S. Department of Health, Education & Welfare, Defendants.

No. 76 Civ. 2027.

United States District Court,
S. D. New York.

Aug. 4, 1977.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs; Jacob Imberman, Robert M. Kaufman, Susan Rosenfeld, M. William Scherer, Gail Sticker, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for the New York City Health and Hospitals Corp.; Peter F. Nadel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for State defendants; Covington & Burling, Washington, D. C., of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for U. S. Dept. of Health, Ed. & Welfare; John M. O'Conner, Asst. U. S. Atty., New York City, of counsel.

LASKER, District Judge.

On March 16, 1977 the Court of Appeals remanded for this court's consideration the question whether Congressional repeal of 42 U.S.C. § 1396a(g) (a provision requiring states participating in the federal Medicaid program to waive their immunity to suit in federal courts with respect to certain claims made by hospital providers of services) as of its effective date subsequent to the entry of final judgment by this court against the State but before the appeal was decided affects the validity of that judgment, and if so whether the statute is constitutional. For reasons set forth below, it is concluded that both such questions must be answered in the affirmative and that therefore (1) the judgment of August 2nd, 1976 insofar as it grants monetary relief against the State of New York, must be vacated and (2) the State defendants' motion to dismiss plain-

tiffs' claims for monetary relief against the State must be granted.

## I.

In 1966 Congress enacted Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., commonly known as the Medicaid program. Under this program, administered by the states pursuant to the statute and to regulations promulgated by the federal Department of Health, Education and Welfare (HEW), providers of medical services are reimbursed by local, state and federal governments for services rendered to eligible patients. The statutory provision of the Medicaid Act at issue in this suit is 42 U.S.C. § 1396a(a)(13)(D) which requires that providers of inpatient hospital services be reimbursed by the states for the "reasonable cost" of providing such services, and that the "reasonable cost" must be determined in accordance with "methods and standards . . . approved by the Secretary [of HEW] and . . . included in the [official state Medicaid plan]."

Since 1970 New York State has utilized a prospective methodology of reimbursing hospitals for inpatient services. Based on predicted costs for the forthcoming year rather than a retrospective formula, the prospective reimbursement methodology is part of the State Medicaid plan. Ordinarily, at the end of each calendar year the State publishes the reimbursement rates for each group of hospitals for the forthcoming year, on the basis of the "methods and standards" contained in the existing State plan.

At the end of 1975, however, New York issued "interim" rates consisting essentially of a "freeze" at the 1975 rates. On May 5, 1976, plaintiffs—a class consisting of all of the approximately 270 voluntary and public hospitals in New York State—sued the Secretary of HEW and various other State officials. They claimed that the "freeze" was illegal in two important respects: (1) it amounted to an amendment of the State plan which had not been, as required by 42 U.S.C. § 1396a(a)(13)(D) approved by the Secretary prior to implementation, and (2) the "freeze" deprived the hospitals of reimbursement for their "reasonable costs" of treating Medicaid patients to which the statute entitled them.

Two months after this suit commenced, the State promulgated a revised formula for determining the 1976 rates. The formula changed several important aspects of the reimbursement methodology: in particular, it lowered the ceiling on reimbursable costs for routine inpatient services from 110% to 100% of the average group costs, and for the first time imposed a ceiling (of 100% of average) on reimbursement for ancillary inpatient costs.[1] On July 16, 1976 plaintiffs amended their complaint and moved for a preliminary injunction against implementation of rates calculated according to the new formula. The amended complaint raised essentially the same objections to the revised methodology as had been raised in the original complaint against the freeze: namely, that the revised formula had not been approved by HEW and thus could not lawfully be implemented, and that reimbursement rates calculated according to the new formula would not reimburse plaintiffs their reasonable costs of providing services.

On July 20th and 28th, 1976 hearings were held on the motion for a preliminary injunction. At this time, the State argued that any grant of monetary relief against it was barred by the Eleventh Amendment. Plaintiffs argued, however, that New York's "consent to suit," executed on March 30, 1976 and incorporated in the State plan, removed any jurisdictional bar to such relief. Effective January 1, 1976, (42 U.S.C. § 1396a(g)) Congress had required states participating in the Medicaid program to consent to suit in federal court by hospitals claiming that the state was not in compliance with § 1396a(a)(13); states which failed to comply with this waiver provision were penalized 10% of the *total* federal Medicaid funds to which they would otherwise have been entitled, 42 U.S.C. § 1396b(*l*). Pursuant to the new law, but

---

1. Plaintiffs challenge numerous other aspects of the new State plan as well.

under protest, New York had executed a consent to suit.

Defendants responded to plaintiffs' argument by urging that the consent to suit was not voluntary, and had for all practical purposes been coerced by the new legislation, which imposed severe financial penalties on states which failed to waive their immunity. They urged that we find the waiver of immunity to be ineffective and the legislation requiring the waiver to be unconstitutional. After briefing and argument on this question, we held, on the authority of *Employees of Department of Public Health & Welfare of Missouri v. Missouri Public Health Dept.,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), that Congress could constitutionally require such a waiver and that the State's consent to suit was valid. We went on to find that § 1396a(a)(13) required prior Secretarial approval of the changes made in the reimbursement methodology, and that such approval had not been given. On August 2, 1976 final judgment on certain counts of the amended complaint was entered for the plaintiffs, and the defendants were permanently enjoined from implementing the challenged regulations until they were approved by HEW. Defendants were directed to recalculate the amounts owed members of the class under the previously approved methodology and to the extent that any hospitals had been underpaid by the State, to pay over the difference. A twelve day stay was granted.

Defendants filed a notice of appeal from the judgment. On August 16th, the Secretary of HEW approved the major regulations which had been found invalid for lack of prior HEW approval. On August 17th, the Court of Appeals remanded the case to the district court to consider whether the Secretary's approval authorized retroactive application of the revised methodology to January 1, 1976. While this matter was *sub judice,* the State applied for a further stay of the August 2nd judgment. On the State's agreement to pay interest as of September 28, 1976 on any monies ultimately found to be owing plaintiffs, a further stay pending decision on the issue remanded was granted.

On October 18, 1976 the President signed Pub.L. 94–552, by which the mandatory waiver of immunity provisions of the Medicaid Act were repealed "effective January 1, 1976." Neither party brought this matter to the court's attention until after it had decided, on November 5, 1976, that the Secretary's approval was prospective only, and that the revised formula could not be implemented as of January 1, 1976 but only from August 16, 1976 (the date of HEW's approval) forward. On November 9th, an order was entered directing defendants to recompute the rates for plaintiffs' class for the period January 1st–August 16th, 1976 and to properly reimburse any members of the class who had received less than their due under the only existing approved methodology.

Defendants applied for a stay of this order, and a further stay of the August 2nd judgment; the application was denied by this court on November 22nd and by the Court of Appeals on December 14th. Subsequently, defendants began and have now substantially completed making the payments required by the court's order to plaintiffs; approximately $40 million is involved.

On the defendants' second appeal from the judgment of August 2nd and order of November 9th, they argued that the repealer legislation deprived the district court of subject matter jurisdiction to award monetary relief against the State and urged that the judgment be vacated. At the same time, defendants moved in this court to dismiss the claims for monetary relief against the State. On January 25, 1977, we denied the motion to dismiss on the ground that since the matter was then pending on appeal, we lacked jurisdiction to consider it. Subsequently, on March 16, 1977 the Court of Appeals remanded the case for us to determine the effect and constitutionality of the repealer legislation.

Two questions are now before us on the remand and the defendants' motion to dismiss: (1) was the repealer legislation intended to affect the jurisdiction of federal

courts in pending cases to grant or enforce awards of monetary relief against the State; (2) if so, is the repealer legislation constitutional.

## II.

*The Repealer Statute*

■ By Pub.L.No.94–182, § 111, effective January 1, 1976, Congress provided that:

"Sec. 111. (a) Section 1902 of the Social Security Act is amended by adding at the end thereof the following new subsection:

(g) Notwithstanding any other provision of this title, a State plan for medical assistance must include a consent by the State to the exercise of the judicial power of the United States in any suit brought against the State or a State officer by or on behalf of any provider of services (as defined in section 1861(u)) with respect to the application of subsection (a)(13)(D) to services furnished under such plan after June 30, 1975, and a waiver by the State of any immunity from such a suit conferred by the 11th amendment to the Constitution or otherwise."

42 U.S.C. § 1396a(g). The penalty for noncompliance, that is, for failure of a state plan to include a consent to suit in federal court, was contained in 42 U.S.C. § 1396b(*l*):

"Notwithstanding any other provision of this section, the amount payable to any State under this section with respect to any quarter beginning after December 31, 1975, shall be reduced by 10 per centum of the amount determined with respect to such quarter under the preceding provisions of this section if such State is found by the Secretary not to be in compliance with section 1902(g)."

By Pub.L.No.94–552, enacted October 18, 1976, Congress provided:

"That subsection (g) of section 1902 of the Social Security Act and subsection (1) of section 1903 of such Act are repealed.

Sec. 2. The amendments made by the first section shall take effect as of January 1, 1976."

Plaintiffs argue that by repealing the mandatory requirement that a state plan must contain a consent to suit and waiver of immunity, Congress did not intend to affect the jurisdiction of district courts in pending cases. They argue "That the removal of a requirement that a state must consent to the exercise of federal judicial power and waive its 11th Amendment immunity does not amount to an ouster of jurisdiction, does not automatically void waivers previously executed and does not authorize the State defendants to withdraw their waiver insofar as it affects this lawsuit."[2] Defendants answer that the only basis for our jurisdiction to enter money judgments against them was the waiver of immunity exercised pursuant to earlier federal requirements; that when the federal requirement of a waiver was repealed retroactive to its effective date, the waiver itself was extinguished retroactively; and that any judgments entered during the period in which the waiver was in effect, which have not become final after appeal or failure to seek appeal, must be vacated.

It is clear from the legislative history that in repealing § 1396a(g) and the penalty provisions of § 1396b(*l*), Congress did not explicitly address the effect of the repealer on pending litigation. It is also apparent, however, that plaintiffs' argument that Congress' *sole* concern related to the penalty provisions is incorrect.

The Senate Report accompanying Pub.L. 94–552 (Sen.Rep.No.94–1240, U.S.Code Cong. & Admin.News 1976, p. 5648) indicates that the reason for initial adoption of the mandatory consent to suit provisions was that "[d]uring 1975, several states instituted alternate payment mechanisms [for medicaid reimbursement] without first obtaining Secretarial approval . . . Hospitals claimed the methods resulted in 'less than reasonable cost' payment but, under existing law, they had no recourse to compel State compliance with the statute

---

2. Brief for Plaintiffs-Appellees filed December 30, 1976 in Court of Appeals case 76–617.

. . ." 1976 U.S.Code Cong. & Admin. News, p. 5650. Thus, "Section 1902(g) [1396a(g)], which requires that States waive their constitutional immunity to suits for money judgments in federal court, was designed to afford providers access to a judicial remedy for purposes of enforcing their legal rights." *Id.* However, in explaining its support for the House-proposed repeal, the Senate Report states that:

"upon reconsideration of this matter, the Committee is unconvinced . . . of the desirability of compelling States to waive their constitutional immunity to suit or of the feasibility of assessing monetary sanctions against States failing to do so in a time of economic stringency at all government levels. For this reason, the Committee strongly recommends that the Senate act expeditiously in repealing this well-intentioned but, in retrospect, inappropriate legislation." *Id.*

The report then recommends that HEW develop alternative ways of assuring that hospitals' rights to reasonable costs be protected, and concludes with an emphasis that the repealer does not affect the hospitals' right to prospective injunctive relief. Thus, the Senate Report makes clear that the repealer was designed to remove both the 10% penalty *and* enforced consent to suit—both aspects of the initial legislation.

The House Report (H.R.Rep.No.94–1122) accompanying the initial proposed repealer legislation shows even greater concern over the undesirability of suits against the states. The first reason in support of the repeal was that:

"[I]n an effort to deal with a particular situation which had arisen in one or two States [freezes on Medicaid rates unapproved by the Secretary], a provision was adopted which now requires all States to waive one of their basic rights—immunity to suit. Further it required them to waive their immunity to suit on all questions relating to the payment of the reasonable cost of inpatient hospital services. . . . *The Department of Health, Education and Welfare, the Governors and Attorneys General of the States are all concerned that the result will be an un-*reasonable *burden of suits which will be costly in terms of time and legal manpower, and which will make efficient program administration virtually impossible.*" H.R.Rep.No.94–1122, 94th Cong., 2d Sess., May 11, 1976 at 4.

As further reasons supporting repeal, the House Committee noted the "sizeable penalty" provisions provided, that some states had been unable under state law to amend their plans in time to avoid those penalties and that other states had refused to make the change "because of their strong concern about the inadvisability of waiving their immunity." Finally, the Committee remarked that "serious questions have been raised concerning the constitutionality of the provision. At least 12 States have instituted suits challenging it." *Id.* at 5. The House Report, like the Senate's, noted that there remained a problem of assuring that providers were reimbursed for "reasonable costs" and urged HEW to develop administrative mechanisms to deal with the matter. Nonetheless, it concluded that "the urgent nature of the problems occasioned by the provisions [of the mandatory waiver statute] require immediate action to remove it from the law."

Plaintiffs make much of the fact that the House Report stresses the fact that without repeal there "will be" a great burden of suits upon the states, suggesting that this manifests a congressional concern only with future lawsuits and not with pending litigation. The argument is based on too slender a reed to warrant relief. The House Committee Report was filed on May 11th (5 days after this lawsuit was filed and before issue was joined). It was not unreasonable for the House Committee to believe that in the five months since the mandatory waiver had become effective, few instances of litigation would have been commenced or advanced to a significant point. Indeed, such a supposition would have been correct, since neither party to this case has found any other case in which a money judgment has been entered against a state in a suit brought against a state in federal court pursuant to the waivers exacted by the now

repealed legislation. In sum, we find no basis for believing that Congress affirmatively intended that its actions should leave pending litigation unaffected. Rather, in our view both reports indicate a pressing desire to remove federal court jurisdiction over suits for money judgments against states: (1) because such suits would interfere with administration of the Act and (2) because coerced consent to such suits was deemed by Congress to be an unwise, if not unconstitutional, remedy for a difficult problem.

Accordingly, we conclude that while not written in such terms, Congress' intent in enacting the forced waiver provision and in repealing it was to expand and contract, respectively, the district court's jurisdiction over suits by Medicaid providers against the states.

We also believe it likely that had Congress directly addressed the problem at hand it would specifically have provided that pending but appealable judgments be vacated. To conclude otherwise would be to assume that Congress intended to sponsor the anomaly of penalizing those states, such as New York, which complied with the original federal command by waiving immunity (though under protest) while rescuing from possible liability the disobedient states who refused in the first instance to obey the Congressional command to waive immunity.

■ Congress' intent, in short, was to undo completely what it had wrought in enacting the forced waiver provision. Plaintiffs argue that the brevity of the repeal statute suggests a lack of Congressional intent to affect pending lawsuits. On the contrary, we find that its brevity is strong evidence of Congress' intent as fully as possible to wipe its previous "mistake" off the books. The reasoning of the court in *De Rodulfa v. United States*, 149 U.S. App.D.C. 154, 461 F.2d 1240, *cert. denied*, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972), is relevant. There, subsequent to a district court judgment for plaintiffs and while portions of the judgment were on appeal, Congress passed a statute which provided that:

"On and after October 17, 1940 [the original enactment date of the predecessor statute] . . . the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans . . . shall be final and conclusive and no other officials or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise."

Although Congress had been aware of the pendency of many lawsuits challenging such administrative decisions at the time of the enactment in 1970, neither the legislative history nor the face of the statute purported to deal with its affect on pending litigation. The Court of Appeals (Robinson, J.), nonetheless found that Congress did intend to withdraw jurisdiction in pending cases:

"We cannot reconcile the specification in the amended section of a date almost 30 years earlier with any notion that Congress intended these proscriptions to apply only to litigation commenced from the date of amendment forward. We see no purpose to be served by reaching back to the effective date of the older finality statute [other] than to impart to it a meaning Congress felt it should always have had. That objective could be achieved only by intercepting . . . claims already in court as well as those that had not arrived, and that is obviously what Congress did." 461 F.2d at 1249.

Similarly, we believe that here, in repealing the forced waiver provision as of its own initial effective date, Congress intended to reach all pending as well as future cases.

■ Plaintiffs urge that such cases as *De Rodulfa* are inapposite because here Congress did not expressly withdraw or limit the jurisdiction of the federal court but merely permitted states which did not wish to be sued in federal court to withdraw their consent to suit without suffering a monetary penalty. It argues from this that the State's waiver of immunity itself was

the jurisdictional prerequisite for entry of the prior money judgment, and that the repealer of the statute does not affect the validity of the waiver which was in effect at the time the judgment was entered. We would agree that a state ordinarily ought not be permitted to waive its immunity to suit—for example in the hope of securing a favorable verdict—and withdraw its consent to be sued if it loses the case. But no such case is before us. New York's waiver in this suit was found to be valid, not because it was "voluntary" in the usual constitutional sense, but because Congress required and intended to require such a waiver as a condition to receipt of federal funds. See *Employees of Department of Public Health and Welfare of Missouri v. Missouri Public Health Department, supra,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251; *Parden v. Terminal R. Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Congress' intention having changed, and Congress having evinced an intention to undo altogether the effects of its earlier requirement, the waiver executed solely to comply with Congress' *earlier* intention must be deemed void as of the date made.

■ Finally, plaintiffs argue that the State twice voluntarily waived immunity and is therefore estopped from presently asserting immunity. Waivers are claimed to arise from (1) the representation of an Assistant Attorney General for the State of New York, made during oral argument on the motion for a preliminary injunction, that if an injunction did not issue the State would pay the plaintiffs any monies owed them, and (2) on his representation in connection with the stay granted following the first Court of Appeals remand that the State would pay interest on any monies ultimately required to be paid to the plaintiffs. Neither of these acts constituted a waiver of the State's immunity. See *Knight v. State of New York,* 443 F.2d 415, 419 (2d Cir. 1971); *Ford Motor Co. v. Dept. of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). At the time the first representation was made the State's original claim that its 11th Amendment immunity had not been waived because the waiver was under protest had not been decided by this court, and it is inconceivable that in such a posture the Assistant Attorney General could have intended the State to waive the very immunity to which it claimed a right. The second representation was clearly intended to take effect only if the State was ultimately found to owe the plaintiffs money in this lawsuit—the very issue raised by the 11th Amendment question. Finally, even if either of the Assistant Attorney General's statements could be construed as an unequivocal waiver, there would be serious doubts as to his authority to bind the State. See *In re Woitasek,* 179 Misc. 947, 40 N.Y.S.2d 514, 515 (Sup.Ct.N.Y.Cty.1943); N.Y.State Const., Art. III § 19; Art. VI § 9; Art. VI § 18.

Accordingly, we find that the repealer legislation requires vacating the August 2nd judgment and dismissal of claims for monetary relief against the State defendants.

## III.

### Constitutionality

■ Plaintiffs contend that in order to avoid difficult constitutional questions, the repealer legislation should be construed not to invalidate the August 2nd judgment. They argue that three constitutional defects would result from interpreting the repealer to vacate the August 2nd judgment: (1) to vacate the prior judgment would deprive plaintiffs of their property right to the judgment without due process of law; (2) permitting the State to withdraw its waiver of immunity would deprive plaintiffs of their property interest in the State's consent to suit without due process of law; and (3) permitting the State to withdraw its waiver of immunity would impair its contract with plaintiffs in violation of Art. I, § 10 of the United States Constitution. Although these claims raise serious and troubling questions, defendants' position—that the repealer legislation, even if so construed, is constitutional—has substantial and persuasive support in precedent.

Plaintiffs rely on *McCullough v. Commonwealth of Virginia*, 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382 (1898) for the proposition that after a trial court judgment has been entered in favor of plaintiff, the judgment may not be affected by a subsequent change in the law upon which it was based, even if the change in law occurs while an appeal from the judgment is pending. In *McCullough*, holders of state bonds had won a trial court declaratory judgment that their bond coupons were genuine. While an appeal was pending the Virginia legislature repealed the jurisdictional statute authorizing plaintiff's suit. After the Virginia Supreme Court reversed the trial court (on other grounds), the Supreme Court on writ of error restored the trial court judgment. It held, in part, that the Virginia state legislature lacked power to divest plaintiff of his judgment, because:

> "the question presented . . . was whether at the time it was rendered [the judgment] was rightful or not. If rightful the plaintiff therein had a vested right which no state legislation could disturb. It is not within the power of a legislature to take away rights which have been once vested by a judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of a legislature to disturb the rights created thereby ceases." 172 U.S. at 123–24, 19 S.Ct. at 142.

If *McCullough* still represents an accurate statement as to when a plaintiff obtains a "vested right" in a judgment, then plaintiffs here prevail. For reasons set forth below, however, we agree with the defendants that modern concepts of the finality of judgments substantially undercut *McCullough's* reasoning on that point, and that the holding in *McCullough* must be viewed in light of its distinctive circumstances.

The Virginia State legislature's action in *McCullough* was the last in a series of legislative maneuvers designed to repudiate the State's bondholders' right, conferred by the law pursuant to which the coupons had issued, to use their bond coupons to pay State taxes; in effect, to expropriate their property without just compensation. The withdrawal of jurisdiction there did not result merely in the extinguishment of a remedy available to enforce the bondholders' rights, but rather in the extinguishment of the obligations themselves. Such legislative action—either by state legislatures or by Congress—is constitutionally prohibited. *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *De La Rama Steamship Co., Inc. v. United States*, 344 U.S. 386, 73 S.Ct. 381, 97 L.Ed. 422 (1952).

In the instant case, however, Congress has not sought to extinguish plaintiffs' right to reimbursement for their reasonable costs of providing inpatient services to Medicaid recipients. Rather, it has removed one quite recently installed enforcement mechanism for securing those rights.[3] HEW continues to play a role in assuring that the states pay plaintiffs their reasonable costs, and the hospitals are permitted to participate in HEW's administrative review proceedings on this point. Moreover, plaintiffs remain free to assert their claim in the New York Court of Claims. Accordingly, the circumstances present in *McCullough* are distinguishable from those involved in the instant case.

Moreover, the determination that a trial court judgment cannot be legislatively divested, as expressed in *McCullough*, has been rejected by virtually every federal court which has since considered the issue. Indeed, the prevailing modern rule was early expressed by Chief Justice John Marshall, in *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801):

> "If subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed . . . in great national con-

---

3. From 1966, when the Medicaid program first came into effect, until January 1, 1976, hospitals had no statutory right to sue States to secure the "reasonable cost reimbursement" which the statute has, since its inception, required.

cerns . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, which cannot be affirmed but in violation of law, the judgment must be set aside."

In short, an appellate court on direct review of a judgment "must apply the law in effect at the time it renders its decision," *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969); accord, *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).[4] "A change in the law between a nisi prius and an appellate decision requires the appellate court to apply the changed law." *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78, 63 S.Ct. 465, 469, 87 L.Ed. 621 (1943).

Plaintiffs argue that none of the Supreme Court decisions on which defendants rely (see pp. 13–14 of plaintiffs' brief) involved situations "in which a change of law operated to divest a plaintiff of his judgment," and accordingly, that such decisions as *Ex Parte McCardle*, 74 U.S. (7 Wall) 506, 19 L.Ed. 264 (1867) and *Bruner v. United States*, 343 U.S. 112, 72 S.Ct. 581, 96 L.Ed. 786 (1952) are distinguishable from and not inconsistent with *McCullough*. The argument is unpersuasive. Nothing in the text of the decisions discussed in plaintiffs' brief supports a distinction between application of intervening change of law on direct appeals from judgments in *plaintiffs'* favor on the one hand, and *defendants'*, on the other. To the contrary, in *Thorpe v. Housing Authority, supra*, plaintiff, a landlord had successfully procured a judgment of eviction which was nonetheless remanded in light of intervening change of law. Moreover, in *149 Madison Avenue Corp. v. Asselta*, 331 U.S. 199, 67 S.Ct. 1178, 91 L.Ed. 1432 (1947), plaintiff's money judgment for overtime pay had already been affirmed by the Supreme Court itself when Congress enacted a statutory change affecting the district court's jurisdiction in the Portal-to-Portal Act; on the defendant's motion for reconsideration of its decision, the court remand-

ed the case to the district court for consideration of the new statute's effect. 331 U.S. 795, 67 S.Ct. 1726, 91 L.Ed. 1822 (1947). The district court, reasoning that the new legislation could constitutionally be applied to modify or destroy plaintiffs' claims "at any time before they have been reduced to unreviewable final judgments," and that "a complainant has not any vested right in the decree of the district court while it is subject to review," 79 F.Supp. 413, 415 (S.D.N. Y.1948), ultimately vacated the judgment in plaintiff's favor. 90 F.Supp. 442 (S.D.N.Y. 1950).

Thus, we conclude that regardless of the decision in *McCullough*, a plaintiff in the circumstances of this case has no vested right protected under the due process clause in a trial court judgment *until* that judgment has become unreviewable. In reaching this conclusion we agree with the Court of Appeals for the District of Columbia in *De Rodulfa v. United States, supra*, 461 F.2d 1240. There the court concluded that Congress' intent, in withdrawing federal court jurisdiction to review certain administrative determinations of veterans' death benefits, had been to withdraw jurisdiction in pending cases. (See discussion in Part II, *supra*.) It therefore held that the money judgments then before it on appeal, although earlier validly entered by the district court, must be vacated. Judge Robinson's reasoning, with which we agree, was that an appeal is not "a new suit in the appellate court," but "a continuation of the suit in the court below," and that the suit remains pending until the appeal is determined. 461 F.2d at 1253. Accordingly, he concluded that the fact that "the judgments antedated the amendment makes for no difference in result as to so much of the judgments as were brought here for review." 461 F.2d at 1251. Judge Robinson specifically quoted from *McCullough* to the effect that once a judgment becomes final legislative action cannot affect it, 461 F.2d at 1252, notes 61, 62, but found simply that "It is evident . . . that these precedents [i. e. *McCullough* and related cases]

---

4. See discussion in Part IV, *infra*.

have no application here since, owing to the instant appeals, the awards of counsel fees never became final." 461 F.2d at 1252–53. Thus, while the basic principle expressed in *McCullough* retains vitality, its view that a judgment, though on appeal, creates vested rights can no longer be accepted: "the portions of the judgments [on appeal] were not investitures of rights ipso facto unalterable by the legislature." *De Rodulfa v. United States, supra,* 461 F.2d at 1253. Accord, *De Dampitan v. Administrator of Veterans Affairs,* 170 U.S.App.D.C. 115, 516 F.2d 708 (1974). See also *Battaglia v. General Motors Corp.,* 169 F.2d 254 (2d Cir.) *cert. denied,* 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).

In light of the singularity of the *McCullough* case, and the great weight of other authority, we hold that a plaintiff has no vested right in the judgment which is protected by the due process clause until the judgment has become final and unreviewable. Accordingly, plaintiffs' first argument must be rejected.

■ Plaintiffs' arguments that the withdrawal of the State's consent-to-suit violates its due process and contractual rights are answered, in our judgment, by the Supreme Court's holding in *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 134 (1934). There, Congress had provided in the War Risk Insurance Act for yearly renewable term life insurance contracts to veterans. Plaintiff, the beneficiary of one such contract sued to recover amounts alleged to be due under the contract. The United States argued that The Economy Act of 1933, which had repealed "all laws granting or pertaining to yearly renewable term insurance," withdrew the United States' consent to suit and thus deprived the court of jurisdiction over the claims.

The court, held, first, that plaintiff had a property interest in the contract protected by the due process clause and that by attempting to abrogate its obligation to pay amounts due under the contract, Congress had violated the Fifth Amendment's injunction that property not be taken without just compensation and due process of law.

However, the court rejected plaintiff's argument that the government's consent to suit could not be withdrawn without impairing the contract:

"Contracts between individuals or corporations are impaired within the meaning of the Constitution whenever the right to enforce them by legal process is taken away or materially lessened. *A different rule prevails in respect to contracts of sovereigns* . . . The rule that the United States may not be sued without its consent is all embracing . . . *Although consent to sue was* . . . *given when the policy issued, Congress retained power to withdraw the consent at any time.* For consent to sue the United States is a privilege accorded; not the grant of a property right protected by the Fifth Amendment. The consent may be withdrawn, although given after much deliberation and for a pecuniary consideration. . . . The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced." 292 U.S. at 580–82, 54 S.Ct. at 844 (emphasis added)

What is significant where consent to suit is withdrawn by a sovereign, wrote the Court, is whether such withdrawal "impl[ies] repudiation." *Id.* at 582, 54 S.Ct. at 845.

"When the United States creates rights in individuals against itself, it is under no obligation to provide a remedy through the courts . . . It may limit the individual to administrative remedies . . . And withdrawal of all remedy . . . would not necessarily imply repudiation. So long as the contractual obligation is recognized, Congress may direct its fulfillment without the interposition of either a court or an administrative tribunal."

The reasoning of the Court in *Lynch* concerning the federal government's right to withdraw its consent to sue at any time without impairing its contracts should apply *a fortiori* to states, expressly protected by the 11th Amendment, and to federal legislative action designed to relieve the states from a previously required waiver of immu-

nity. While the *Lynch* Court found that there had been a repudiation, since the government refused to make any payments on the contracts, in the instant case there is none. The defendants here continue to recognize their statutory obligation to pay "reasonable costs" as reimbursements to the hospitals; the dispute is as to the amount of those costs. Moreover, the hospitals are not without other legal redress to secure their rights; for example, as we have pointed out, HEW continues to have responsibility for assuring that state plans actually result in payment of reasonable costs, and the hospitals as providers may participate in the administrative review proceedings. Furthermore, we understand that plaintiffs have already asserted alternative claims for money judgments against the State in the New York State Court of Claims. Finally, plaintiffs remain free to sue the states in federal court for prospective injunctive relief if the states act in violation of federal law. Thus, it cannot be said that Congress, by enacting the repealer legislation, has either foreclosed all remedies or effective enforcement of a substantive right, or repudiated the substantive right itself. Accordingly, we find no constitutional violation on these grounds.

We conclude that the repealer statute is constitutional even though it results in vacating the August 2nd judgment and dismissal of the claims for monetary relief against the State.

### IV.

Plaintiffs' final argument is that under the standards set forth in *Bradley v. Richmond School Board, supra,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476, it would be a "manifest injustice" to apply the repealer legislation retroactively so as to vacate the previously entered judgment. Although we are not unsympathetic to plaintiffs' position, having found (in accordance with the great weight of district court authority) that the State acted in blatant disregard of the federal requirement that the Secretary approve prior to implementation changes in the formula used to determine the State's reimbursement for inpatient services provided under Medicaid, we cannot agree that *Bradley* is apposite. The issue there was whether the district court erred in awarding attorney's fees for work done prior to the enactment and effective date of a statute authorizing awards of attorneys fees in school desegregation cases. *Bradley* stated the general rule, in determining whether a statute may be given retroactive effect, to be that a ". . . court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016.

*Bradley,* however, did not address the question whether creation of a "manifest injustice" through retroactive application of a law which Congress expressly stated to be retroactive would require the court to ignore the effect of the change in statute. Given the clear rule that Congress has power at any time to withdraw jurisdiction from the federal courts in pending cases, it does not seem to us that *Bradley* is relevant, even if plaintiffs could establish that the repealer legislation worked a "manifest injustice" upon them. Moreover, we doubt plaintiffs' ability to establish this proposition. Although no doubt the State acted in violation of law, the Secretary of HEW has now determined that the formula used by the State, and by which we understand the hospitals were compensated in 1976 (excluding the amounts paid over in accordance with our judgment) provided the hospitals with reimbursement for their "reasonable costs." Although this question is presently at issue in the lawsuit, regardless of the outcome on that issue the Secretary's finding that the formula does provide reasonable costs reimbursement is strong evidence that if an injustice exists, it is not "manifest." Moreover, there remains the possibility that the hospitals will still be able to recover the amounts involved in the August 2nd judgment in the State courts.

Thus we conclude that the "manifest injustice" rule is no bar to vacatur of the August 2nd judgment.

For the foregoing reasons, the judgment of August 2nd is vacated insofar as it awards plaintiffs monetary relief against the State defendants, and the motion to dismiss the complaint insofar as it seeks monetary relief against the State is granted.

Submit order on notice.